Johney Westley CARSON,
et al.  Plaintiffs

v.

Royce McNEAL, et al.  Defendants

No. CIV.A. 3:03CV548LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

June 23, 2005.

---

Robert Charles Robb, Robb Law Offices, PLLC, Vicksburg, MS, for Plaintiffs.

William J. Little, Jr., Lentz & Little, PA, Christopher R. Shaw, James W. Craig, Kenneth J. Grigsby, Ross F. Bass, Jr., Phelps Dunbar, Jackson, MS, Mary Gabrielle Hils (PHV), Dinsmore & Shohl, LLP, Cincinnati, OH, Ronald A. Yarbrough, Brunini, Grantham, Grower & Hewes, Blayne Thomas Ingram, Scott, Sullivan, Streetman & Fox, P.C., Walker W. Jones, III, Barry Wayne Ford, Joseph Kyle Fulcher, Lawrence M. Coco, III, Tiffanee Nicole Wade–Henderson, Gene D. Berry, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Jackson, MS, D. Alan Thomas (PHV), H. Lanier Brown—PHV, II, R. Gordon Sproule—PHV, Jr., Huie, Fernambucq & Stewart, Birmingham, AL, Kathleen P. Morgan, James J. Crongeyer, Jr., Watkins & Eager, Robert T. Gordon, Jr., Mitchell, McNutt & Sams, PA, Jackson, MS, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant The Provident Bank for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Ruby Johnson, Dedra Johnson, Edmond Palmer and Mazola Palmer have responded in opposition to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that the motion is well taken and should be granted.

On May 28, 1999, Ruby and Dedra Johnson refinanced their home mortgage through Southern Mortgage Company, a Louisiana-based mortgage lender, borrowing $98,496 to pay off their existing mortgage and other debts. On June 16, 1999, Edmund and Mazola Palmer refinanced their home mortgage through Southern, borrowing $25,000 to pay off their existing mortgage and other debts. Within days of disbursement of loan funds to these plaintiffs, their loans were sold to The Provident Bank (Provident). Nearly four years later, on March 18, 2003, the Johnsons and Palmers, along with twenty-two other plaintiffs who had also been involved in mortgage refinance transactions with Southern, filed this lawsuit in the Circuit Court of Hinds County against Provident and Southern's "corporate managers," alleging that these defendants, together with Southern and the closing attorney on the loans, Ray Gibson, and his a title/closing company, Universal Title & Escrow, L.L.C., all conspired to engage in predatory lending practices to the detriment of plaintiffs.[1] They alleged, more particular-

---

1. Plaintiffs did not sue Southern, which filed for bankruptcy and is now defunct, or Gibson,

ly, that Provident and Southern conspired to "target certain categories of non-wealthy persons" who were in situations of economic duress, had limited or sub-prime credit histories and had limited experience with complex mortgage transactions, and to, in effect, take unfair advantage of them by first inducing them to refinance their mortgages and then charging them "unreasonable and unnecessary closing costs and expenses associated with the mortgage loan." Plaintiffs alleged that Southern solicited plaintiffs to apply for mortgage loans without disclosing that Provident, not Southern, was the actual lender, and that Provident, through its agents, including Southern and Gibson, who had been hired by Provident, made false representations to plaintiffs "by acts or omissions in regard to the subject loan closing and/or settlement," and failed to have a notary public present at the loan closing to notarize plaintiffs' signatures on their deeds of trust. Plaintiffs have alleged claims for negligent and/or intentional misrepresentation, breach of the duty of good faith and fair dealing, for which they seek damages, and in addition, they seek an accounting of all monies paid in the transaction and a declaratory judgment that the deed of trust is invalid.

Provident submits that it is entitled to summary judgment for one or more of a number of reasons, including that (1) it is not vicariously liable for any acts or omissions of Southern, its managers, or the closing attorney or his company, Univer-

sal, because it was not the "funding lender" of the subject loans and because those persons/entitles were not agents of Provident; (2) Provident is entitled to all of the protections afforded a holder in due course; (3) plaintiffs' claims are barred by the applicable statute of limitations; (4) plaintiffs' notes and deeds of trust are valid and enforceable as a matter of law; and (5) plaintiffs' conspiracy charge fails inasmuch as it is unsupported by any viable underlying cause of action.

Plaintiffs' response to Provident's motion is largely devoted to their argument that Provident is foreclosed from enforcement of the notes and deeds of trust inasmuch as Southern, a foreign corporation doing business in Mississippi, had no certificate of authority to do business in Mississippi at the time of the subject transaction, its certificate of authority having been revoked by the Secretary of State on account of Southern's failure to provide annual reports and pay applicable fees.[2] Plaintiffs reason that because Southern had no certificate of authority at the time of the transactions, then under Mississippi's door-closing statute, Miss.Code. Ann. § 79–4–15.02(a), Provident, as Southern's assignee, is barred from using any federal or state court in Mississippi to enforce the mortgage and/or note of the subject transactions, *see* Miss.Code Ann. § 79–4–15.02(b).[3] In the court's opinion, for a variety of reasons, plaintiffs' argument is neither well-founded nor relevant.

who is deceased, or Universal, which is defunct.

**2.** The court notes that plaintiffs devote 18 pages of their 20–page brief to this argument.

**3.** Section 79–4–15.02 states, in pertinent part, (a) A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority.

(b) The successor to a foreign corporation that transacted business in this state without a certificate of authority and the assignee of a cause of action arising out of that business may not maintain a proceeding based on that cause of action in any court in this state until the foreign corporation or its successor obtains a certificate of authority.

■ First, whereas Mississippi Code Annotated § 79–4–15.01(a), provides that "[a] foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State," that section goes on to state that "[c]reating or acquiring indebtedness, mortgages and security interests in real or personal property," and "[s]ecuring or collecting debts or enforcing mortgages and security interests in property securing the debt" *"do not constitute the transaction of business within the meaning of subsection (a)."* (Emphasis added). Thus, Southern did not need a certificate of authority to enter the mortgage transactions with plaintiffs.

■ Furthermore, even if this exception were for some reason inapplicable to Southern so that Southern was required to have a certificate of authority for these transactions,[4] the fact that it lacked a certificate of authority would not render the loans and deeds of trust securing the loans invalid or unenforceable. In this regard, Mississippi Code Annotated § 79–4–15.02(c) states:

> Notwithstanding subsections (a) and (b), the failure of a corporation to obtain a certificate of authority does not impair the validity of its corporate acts or prevent it from defending any proceeding in this state.

Finally, plaintiffs' focus on the door-closing statute is inexplicable in any event, since in this action, Provident is merely defending the lawsuit brought *against it* by plaintiffs for predatory lending and is not in this action undertaking to use the courts of the state to enforce the mortgages and deeds of trust. For all of these reasons, the door-closing statute is no bar to Provident's motion for summary judgment.

■ Among other grounds, Provident has contended in its motion that plaintiffs' claims are barred by the applicable statute of limitations, which indisputably is the three-year statute of limitations established by Mississippi Code Annotated § 15–1–49(1). All of plaintiffs' claims are based on misrepresentations or omissions relative to their refinance transactions. Their causes of action thus accrued at the time of their respective transactions, which occurred well over three years before this suit was brought. *See Stephens v. Equitable Life Assur. Society of U.S.*, 850 So.2d 78, 81 (Miss.2003). Evidently anticipating that the defendants would assert a statute of limitations defense, plaintiffs recited in their complaint that they could not have discovered their cause of action due to defendants' fraudulent concealment; yet plaintiffs have wholly failed to identify any facts that would support their invocation of this tolling doctrine.[5] The Mississippi Supreme Court has explained fraudulent concealment as follows:

> Under the doctrine of fraudulent concealment, the running of the statute of

---

4. Plaintiffs declare in their response that

> [t]he exceptions of the Mississippi Code are clearly addressed to unitary acts by foreign corporations without any other in-state connections or intrastate activity or such multiplicity of transactions within the state the state [sic] to give an inference of having subjected itself to local jurisdiction.

They similarly argue that the exceptions are inapplicable because Southern at one time had a certificate of authority but allowed it to become revoked. They cite no authority in

support of either argument, and the court is aware of none.

5. *See* Miss.Code Ann. § 15–1–67, which provides:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

limitations is tolled. [*Stephens v. Equitable Life Assur. Soc'y*, 850 So.2d 78, 83 (Miss.2003) ] (quoting *Robinson v. Cobb*, 763 So.2d 883, 887 (Miss.2000)). This requires proof of two elements: subsequent affirmative acts of concealment and due diligence. That is, there must be some subsequent affirmative act by the defendant which was designed to prevent and which did prevent discovery of the claim. *Stephens*, 850 So.2d at 83–84. Proof of this act must also be coupled with proof that despite his or her due diligence, the plaintiff was unable to discover the claim. *Id.*

*Andrus v. Ellis*, 887 So.2d 175, 181 (Miss. 2004). Provident points out that the loan documents signed by plaintiffs and provided to them at the time of their respective loan transactions included all the information that plaintiffs contend was concealed from them or misrepresented to them. Provident thus contends that plaintiffs cannot prove that they could not have discovered the basis for their claims in the exercise of due diligence, for merely reading the loan papers would have required very little expenditure of effort on plaintiffs' part. *See Andrus*, 887 So.2d at 180 (" 'In Mississippi, a person is charged with knowing the contents of any document that he executes,' " and "is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract.' ") (citations omitted).

In their response to the motion, plaintiffs do not dispute this, nor do they deny that they have failed to show any affirmative act of concealment. In fact, plaintiffs do not attempt to refute Provident's statute of limitations argument; they do not so much as acknowledge this proffered ground for summary judgment, even in passing. Inasmuch as plaintiffs have failed to create a genuine issue of material fact with regard to Provident's statute of limitations defense, the court concludes that plaintiffs' claims are time-barred and that summary judgment is proper on that basis.

■ Even were the claims timely, however, plaintiffs still could not survive the present motion for summary judgment. Plaintiffs' complaint against Provident is premised on alternative allegations that it is either directly liable as the actual "funding lender," [6] or vicariously liable for the acts of its alleged agents, Southern and its managers, Gibson and Universal. In its motion, and with accompanying proof, Provident explains the funding of the subject loans. Specifically, according to the affidavit of Martin Weiss, former Vice–President of Provident, and the deposition testimony of Dannie Snow, Vice–President of Evangeline Bank, and additional documentary proof, Southern is an independent banking company, known as a "correspondent lender," that has its own warehouse line of credit with Evangeline Bank, a Louisiana banking institution. The Johnson loan was made on May 28, 1999, and proceeds were disbursed to the Johnsons on June 3, 1000. The loan was funded by Southern using funds wired from its line of credit at Evangeline Bank to Universal's account prior to closing. Provident purchased the Johnson loan from Southern on June 8, 1999, wiring the money for the loan to Evangeline Bank for credit to Southern's account. The Palmer loan was funded in the very same manner. That loan was made by Southern to the Palmers on June 16, 1999, and loan proceeds were

---

6. Plaintiffs' theory in this regard is apparently that Provident, as the actual lender, or funding lender, controlled the transaction and had the duty to make all the disclosures required by law, and of course, the corresponding duty to not mislead the borrowers.

disbursed to the Palmers on June 21, 1999, by funds wired from Southern's line of credit at Evangeline Bank to Universal; that loan was purchased by Provident on June 23, 1999.[7] In sum, it appears that each transaction was a bona fide secondary market transaction in which Provident merely purchased a loan previously made by Southern.[8]

The only evidence relied on by plaintiffs in opposition to Provident's proof as to the funding of the transactions consists of documents which reflect Provident's pre-approval of the loan, including a "Final Approval/Clear to Close" document. Yet Provident has explained in its motion, without contradiction by plaintiffs, that while it did pre-approve both of these loans, such pre-approval is common in the industry. The correspondent lender fully intends to sell the loans it makes, and to do so as quickly as possible, and hence seeks pre-approval from prospective buyers of a loan prior to making the loan to ensure there is a market for the loan. However, the fact that Provident pre-approved the loans in anticipation of purchasing the loans following closing does not render Provident liable for nondisclosures or misrepresentations by the actual lender, Southern, unless it can be shown that the actual lender was, in fact, Provident's agent, for whose acts it is vicariously liable.[9]

Toward that end, plaintiffs do allege that Southern, its employees, and Gibson and Universal were all agents of Provident, for whose acts Provident is vicariously liable; yet the unrefuted proof submitted by Provident belies this allegation. The evidence clearly shows that Southern was an independent lender, whose relationship with Provident, as with other lenders to which it marketed its loans, was that of buyer and seller, not principal and agent. Moreover, Weiss states unequivocally in his affidavit that Gibson and Universal were not hired by Universal. Plaintiffs have offered no proof to create a triable issue of fact with respect to their agency allegations.

In addition to its arguments on these points, Provident maintains that it is entitled to all the protections given to a holder in due course that purchased the

7. The proof, via Weiss's affidavit, also shows that Provident did not solicit the Johnsons or Palmers to refinance their loans; it had no contact with them in connection with the loans; it was not privy to the negotiations between Southern and the Johnsons and Palmers; and it did not prepare the loan documents.

8. *See Moreno v. Summit Mortgage Corp.*, 364 F.3d 574, 577 (5th Cir.2004), in which the court described this kind of routine transaction as a "bona fide transfer of a loan obligation in the secondary market" which, in accordance with 25 C.F.R. § 3500.5(b)(7), was not covered by the federal Real Estate Settlement Practices Act. The court stated,

The sale of the Morenos' mortgage loan by Summit to First Nationwide was a bona fide secondary market transaction under Regulation X. Summit borrowed the money to fund the Morenos' mortgage loan through its established line of credit with Bank United, not First Nationwide; and Summit closed the loan in its name. Summit was the only party responsible for repaying Bank United and was therefore the real source of funds for the mortgage loan. Moreover, the agreement between Summit and First Nationwide for the latter's purchase of the mortgage loan-even if it occurred before closing-has no bearing on Summit's status as the real source of funds and having the real interest in the transaction, consistent with Regulation X. First Nationwide was not obligated to Bank United to pay the money borrowed by Summit; instead it was obligated to pay Summit the purchase price of the loan, as agreed upon between First Nationwide and Summit.

9. Indeed, in *Moreno, supra*, the real lender was Summit, even though there was a pre-existing agreement that First Nationwide would purchase the loan following closing.

loan in good faith and for value. The applicable statute provides that a holder of an instrument is a holder in due course if:

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) [t]he holder took the instrument (I) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 75–3–306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 75–3–305(a).

Miss.Code Ann. § 75–3–302(a) (Rev.2002) (quoted in *Stuckey v. Provident Bank,* —— So.2d ——, ——, 2005 WL 613535, at *9 (Miss.2005)). For its part, Provident relies on Weiss's affidavit, in which he declares that Provident was unaware of any irregularities in the origination or closing of the Johnson and Palmer loans at the time of their purchase. Plaintiffs, however, argue that there is a triable issue with respect to whether Provident qualifies as a bona fide purchaser in good faith and for value. Specifically, plaintiffs argue that Provident cannot claim holder in due

course status inasmuch as it was or should have been aware of irregularities in the loan documents, in that the assignments were "notarized in blank," which plaintiffs contend "should have raised questions concerning the notarial acts", and a "Transfer/Goodbye Letter" dated June 22, 1999 on the Palmer loan shows that it was signed by the Palmers on June 16, 1999, which should have led Provident to "question[ ] the honesty and accuracy of the closing documents." [10] Manifestly, however, these circumstances which plaintiffs suggest tend to undermine Provident's claim to be a holder in due course do not create a triable issue of fact.

Though not altogether clear, plaintiffs' argument concerning the assignments being "notarized in blank" appears to be based on the fact that the blanks on the assignment form for the mortgage book and page numbers were left blank on the notarized assignment documents included in the loan package provided to Provident, while the recorded assignments include the book and page numbers. The court, however, is aware of no authority to suggest that the addition of the book and page number post-execution is improper, and it certainly is not improper to an extent that the omission of the book and page number on a notarized assignment should have put an assignee on notice that other negotiable instruments in the transaction may not have been properly notarized. *Cf. Securities Investment Co. v. Cohen,* 241 Miss. 549, 131 So.2d 439, 442 (1961) (question

---

**10.** As recognized by Provident, the doctrine of holder in due course pertains to the purchase of negotiable instruments, such as the promissory notes executed by Johnsons and Palmers. The doctrine does not apply to the assignment of a non-negotiable instrument, such as a deed of trust. Provident thus contends that while there were no apparent irregularities in the assignment document, even if there had been, that would not deprive it of holder in due course status since there is no allegation

by plaintiffs that the promissory notes themselves bore "such apparent evidence of forgery or alteration or [were] otherwise so irregular or incomplete as to call into question [their] authenticity." Miss.Code Ann. § 75–3–302(a)(1). The court need not consider this position since it agrees with Provident that the purported irregularities identified by plaintiffs were not such as would deprive Provident of holder in due course status.

whether one is holder in due course is determined by one's honesty and good faith and not whether he was diligent or negligent).

Plaintiffs' argument relating to the Transfer/Goodbye letter, which letter served to inform the Palmers that their loan would be assigned to Provident, is based on their interpretation of the letter as having been prepared June 22, 1999. They appear to claim that the Palmers could not possibly have signed the document on June 16, 1999 when the document indicates it was prepared six days later, and that this should have indicated to Provident that all was not right with the loan transaction. The document, however, does not reflect any date of preparation. Rather, it is merely a document that plaintiffs signed at the closing which reflects, properly, that the loan funds would be disbursed on June 21, 1999 (to account for the three-day right of rescission), and the loan would thereafter be assigned to Provident on June 22, 1999. Accordingly, this letter would not have given cause for suspicion on the part of Provident that something was amiss.

From the foregoing, the court would readily conclude that if the assignment to Provident was valid, Provident became a holder in due course. Plaintiffs argue, though, that Provident has yet to provide a valid assignment, and they claim, specifically, that the signature of Royce McNeal on the assignment documents, on behalf of Southern, appears to have been forged. In support of this position, they argue simply that a comparison of McNeal's signature on the assignments to his later signature on Southern's bankruptcy documents shows that the two signatures are not the same. Plaintiffs thus conclude that McNeal's signature on the assign-

ments is not valid. This proof is woefully insufficient to create a genuine issue of fact.[11]

▋ Plaintiffs have alleged that the deeds of trust are unenforceable because they were never delivered to the trustee, and because the notary acknowledged plaintiffs' signatures on the deeds of trust without having witnessed the signing as required by Mississippi Code Annotated § 97–21–7. They have offered no authority to sustain either position. As Provident notes, no authority exists under Mississippi law that a deed of trust must be delivered to a named trustee in order to be valid. And as for the notary's acknowledgment, the law is clear that a defectively notarized deed of trust, even if not constructive notice to third-parties, is valid as between the parties and their heirs and assigns. *See Associates Financial Services Co. of Miss., Inc. v. Bennett*, 611 So.2d 973, 976 (Miss.1992).

Provident finally, and correctly argues that plaintiffs cannot prevail on their conspiracy claim because they have no viable underlying cause of action. That is, since plaintiffs have failed to prove any wrongdoing by Provident, their conspiracy claim against Provident must fail.

Based on the foregoing, it is ordered that Provident's motion for summary judgment is granted.

---

**11.** So far as the court is aware, McNeal has not denied that the signature is genuine, and plaintiffs have offered nothing more than their lay opinion that the signatures were not made by the same person because they do not match.