**J.D. REYNOLDS, et al.,
Appellants/Plaintiffs,**

v.

**Imogene DAY, et al.,
Defendants/Appellees.**

Court of Appeals of Tennessee,
Eastern Section.

March 6, 1990.

Application for Permission to Appeal
Denied by Supreme Court
June 4, 1990.

Thomas L. Kilday, Greeneville, for appellants/plaintiffs.

Kenneth Clark Hood, Greeneville, for defendants/appellees.

OPINION

INMAN, Special Judge.

I

The appellants are the contestants of the holographic will of Lawrence Reynolds. The jury resolved all issues favorably to the will. We find all of the issues presented for review to be without merit and affirm.

The disputed holographic will, dated February 19, 1986, was admitted to probate in common form on March 4th, 1987, by the probate court for Greene County, Tennessee.

A complaint to contest the will on the grounds of undue influence and lack of mental capacity was filed by twenty-four of the decedent's collateral heirs on November 3, 1987. The complaint also alleged that the paper writing was not the will of Lawrence Reynolds, and a jury trial was demanded.

The proponents filed an answer asserting that the holographic will was the will of the decedent who was not unduly influenced in its execution and that it was not written at a time that the testator lacked sufficient mental capacity.

The proponents filed issues for trial pursuant to Tenn.Code Ann. 32–4–104, as follows: (1) Were all of the material provisions of the paper writing dated the 19 day of February, 1986, in the handwriting of Lawrence Reynolds and did he sign this writing? (2) Was Lawrence Reynolds mentally capable of making a will on the 19th day of February, 1986? and (3) Was Lawrence Reynolds unduly influenced in the preparation of this Last Will and Testament by Glen Reynolds, Margaret Laughner, Grady Davis, Imogene Day, or Claude "Tiny" Day?

The trial commenced on December 6, 1988. At the close of the proof, the Court directed a verdict against the contestants with respect to the first jury issue. At the conclusion of the trial on the 14th day of December, 1988, the jury returned a verdict which sustained the will.

## II

The first issue presented for review is whether the Court was correct in refusing to charge the contestants' special request that once a confidential relationship between a testator and beneficiary is shown to exist, a presumption of invalidity arises which must be overcome by clear and convincing evidence, as contrasted to a preponderance of all the evidence, as charged by the Court.[1]

We reproduce the will:

February 19, 1986

At my death I appoint Glen Reynolds as my administrator over all my assets. The home I live in goes to Imogene Day and her husband Tiny Day. The Mitchel farm goes to Betty's niece and nephew, the Davis children. And the money also to them.

Lawrence C. Reynolds

A lockbox at the old First National Bank, now Commerce I think. Have the dog put to sleep or take her home with you.

The verdict accredited evidence that about 5:00 A.M. on February 19, 1986 Glen Reynolds received a telephone call from his cousin Lawrence Reynolds, the decedent, who told him that he thought he was having a heart attack. Lawrence declined Glen's offer to call an ambulance, electing to ride with Glen to the hospital. When Glen arrived at Lawrence's residence the lights were on, and Lawrence was ready to leave. He asked Glen to make sure the lights were off and the furnace turned down, and locked the door behind them. Glen drove him to the hospital and stayed with him until he was admitted. He described Lawrence as "very normal" and testified that he observed nothing to suggest that there was anything wrong with his mind. As a first cousin, Glen would receive more if the will were invalidated than if it were upheld.

Glen visited with Lawrence practically every day in January, February and March, 1986. He testified that on each of these occasions Lawrence was of sound mind. He recited instances in support of this opinion; on February 15, Lawrence called him "to come over and look at my furnace". Lawrence had tried to call Ricker Plumbing and Heating, but they were closed, it being Saturday. Glen thereupon made temporary repairs. He advised Lawrence to call Ricker Plumbing and Heating on Monday, and Lawrence agreed to do so.

On February 17, 1986, Lawrence did in fact call Ricker Plumbing and Heating, whose employee, John Jay Williams, responded. Lawrence recognized him when arrived, and suggested that he knew where to find the furnace since he had installed it several years before. Williams testified that Lawrence's conversation was sensible, and that he did not observe anything to suggest that he was confused.

Betty Ingle testified that she delivered a rent check to Lawrence in the hospital on February 19, 1986, after she learned from a neighbor that he had been admitted. When she entered his room he recognized her, asked about her husband by name, and about her business. He told her about his illness. She observed nothing unusual about his mental condition and he did not appear confused. In her opinion, he was of sound mind.

Rex Bowers operated the Mitchell farm for Lawrence Reynolds for approximately thirty years. He conferred with Lawrence every Tuesday and Thursday, and sometimes more often. He visited Lawrence every day while he was hospitalized, and was of the opinion that he was of sound mind on every occasion that he saw him.

Imogene Day saw Lawrence on February 18, 1986, the day before he wrote his will and entered the hospital. She testified that he called and requested her to come over because he was sick. She went to his

---

1. The appellants do not present issues for review as required by Rule 27(a)(4) Rules of Appellate Procedure. Moreover, the errors "assigned" are generalized, as "the Court erred in its instructions to the jury". Ordinarily, we would not consider the appeal further than to make this observation, but the appellees have undertaken to modify and paraphrase the issues which we will accordingly consider.

house and stayed with him because he did not want to go to the emergency room. She talked with him for about an hour, and testified that his conversation was sensible. He did not appear confused or depressed. She did not observe anything that would suggest that his mind was not functioning properly.

She learned the next day from Glen Reynolds that he had taken Lawrence to the hospital. She visited Lawrence for about thirty minutes on February 19, 1986, and also visited with him each day until he was dismissed. She testified that his conversation was not confused, and that he was not disoriented or depressed. She believed him to be of sound mind.

When confronted with the medical records from the first hospitalization, Imogene Day testified that she never observed anything that would suggest that Lawrence Reynolds was suffering from severe depression or that he had a "manic depressive disorder." She thought that he may have been dehydrated and malnourished, owing to poor eating habits, but denied that he had frequent crying episodes, or that he acted hostilely toward the nursing staff. Mrs. Day was employed by Reynolds at his ice cream company during the 1960's. She began assisting Reynolds in his home following the death of his wife in 1984, doing such things for him as writing checks and running errands. Reynolds gave her the keys to his house and lockbox. In September, 1985 he gave her a diamond ring worth $3000.00. In the petition she filed seeking appointment as co-representative of the estate she described herself as

"A trusted friend of the decedent and assisted him with his business affairs and looked after his personal matters for the past several years and at the request of the decedent has rendered services for many years. She has looked after the business affairs of the decedent since the death of his wife and during the period of his lengthy illness. She has likewise rendered personal services, the decedent entrusted her with the key to his lockbox at the bank and to his house."

Mrs. Day testified that during Lawrence's second hospitalization, she confronted Dr. Keebler about his recorded diagnosis of confusion and disorientation. He explained that this was done to facilitate Medicare benefits. She complained to Dr. Keebler that Lawrence was being overmedicated with "Haldol", and he thereupon reduced the dosage. Dr. Keebler admitted that a side effect of this drug is confusion and disorientation.

Daisy Yost and Minnie Anderson were Reynolds' neighbors who lived on either side of him. Each testified that she had known Lawrence as a neighbor for 35 years or more and had seen him on a regular basis varying from daily to two to three times per week. Each testified that Lawrence always recognized her and inquired about members of her family by name, even though some of them had moved out of town years before. Neither observed anything about Lawrence that would suggest he was having mental problems.

Lawrence's cancelled checks and bills were introduced through the testimony of Imogene Day, who assisted him with his finances during his lifetime and served as co-administrator of his estate after his death. These records reflect that he wrote numerous checks, in January, February, and March, and a bill always corresponded to the amount of the check. In each month, the check to the water company was written for the combined amount billed to two separate tracts of property, and his addition was correct. Frequently the checks bore a notation to identify the bill. During the February hospitalization, recalling that his taxes were due, he requested of Imogene Day that she bring him a check so that the taxes could be paid.

Ben Russell testified that he had known Lawrence for decades, and that he would come by his hardware store two or three times a week. While there, they would talk, and Lawrence would have no trouble recalling events from their past. He never seemed disoriented or confused. Russell never observed anything to suggest that Lawrence was incompetent.

Claude "Tiny" Day had known Lawrence since shortly after World War II. He and his wife, Imogene Day, and Lawrence and his wife had socialized until his wife died, and he continued to see Lawrence after her death. Lawrence would visit with Day at his theater two to three times a week after his wife's death. Day saw him twice during the February, 1986 hospitalization and testified that he talked intelligently, was able to recall events accurately from the past, was oriented, and did not appear depressed.

The attending physician, Dr. Keebler, significantly concluded that he was not prepared to testify that Lawrence was incapable of making a will on February 19, 1986, and stated that there was nothing out of the ordinary about Lawrence's physical and mental condition for a person of his age.

The medical records for the February, 1986 hospitalization clearly reflect that Lawrence signed a consent for treatment upon admission and that he went over an admission checklist with the hospital staff and signed it. The physician's orders in the progress notes from that hospitalization reflect that he was given the drug Haldol throughout the February 1986 hospitalization, starting on the first day. As previously noted, Dr. Keebler explained that a side effect of this drug was confusion and disorientation.

The appellants initially contend that a number of people unduly influenced Lawrence in the making of his will, but the thrust of their brief is directed to the relationship between the testator and Imogene Day. We have gone to some length to summarize and paraphrase the evidence, particularly as it impacts their specific relationship. There is an abundance of evidence to support the verdict, an unquestioned point, and the thrust, as we have stated, of the appellants' argument on the appeal is the jury instruction.

■ They rely on the case of *Richmond v. Christian*, 555 S.W.2d 105 (Tenn.1977) in support of their theory that if a confidential relationship is shown to exist and the dominant party receives a benefit from the other party the transaction is presumed to be invalid unless rebutted by clear and convincing evidence.

*Richmond* was a non-jury action to set aside a deed on the ground its execution was procured by undue influence arising out of a confidential relationship. The Supreme Court held that when two parties enter into a confidential relationship and the dominant party receives a benefit therefrom, a presumption of invalidity arises which is rebuttable and

"the rule in this State is that clear and convincing evidence of fairness will suffice" [to rebut the presumption] citing

*Roberts v. Chase*, 25 Tenn.App. 636, 166 S.W.2d 641 (1942), which was a non-jury action to set aside a deed on grounds of undue influence wherein the appellate Court found a confidential relationship existed between the parties.

In *Roberts*, the Court held that

"... where the presumption is rebuttable it can be rebutted only by clear evidence of good faith, full knowledge and of independent counsel and consent; or by 'the clearest and most satisfactory evidence to be addressed'" ...

We believe the evidence in the case at bar was sufficient to require a charge concerning a confidential relationship, *Taliaferro v. Green*, 622 S.W.2d 829 (Ct.App. 1981), but as held in *Taliaferro*, the quantum of evidence to overcome the presumptive effects of a confidential relationship is a preponderance only, *Thomas v. Hamlin*, 56 Tenn.App. 13, 404 S.W.2d 569 (1964), *Kelley v. Brading*, 47 Tenn.App. 223, 337 S.W.2d 471 (1960), and the jury was so instructed.

In *Taliaferro*, a jury case involving issues similar to the case at bar, the Court stated

"where, however, the contestant shows the existence of suspicious circumstances such as a confidential relationship in combination with the beneficiary's involvement in procuring the will ... there arises the presumption of fraud or undue influence which a proponent must overcome by a preponderance of the evidence."

*Taliaferro,* decided in 1981, and approved by the Supreme Court, appears to be arguably at odds with *Richmond,* supra, decided in 1977, although the latter involved a gift inter vivos the validity of which was contested in a non-jury action. Tennessee Pattern Jury Instruction 11.60, which was relied upon by the trial judge, also uses the preponderance standard, and while these Instructions have not received the official imprimature of the Supreme Court, we acknowledge their careful preparation and de facto approbation and consequently conclude that the preponderance standard reflects current law.

### III

Appellants next insist that the trial judge did not function as thirteenth juror because he did not approve the verdict. We have considered the remarks of the trial judge, particularly those apropos of his role as thirteenth juror, and note his comment "The Court does, in fact, approve the verdict of the jury". It would be productive of no result to require his approval to be couched in differing words, if, indeed any occurred to us.

### IV

■ Appellants next insist that certain statements of the testator relating to his relationship with Imogene Day were improperly excluded. Day and her husband were devised the testator's home, amounting, in dollars, to about 10% of his estate, and testimony was offered, as heretofore noted, which tended to establish a confidential relationship between Mrs. Day and the testator. One instance of proffered testimony involved a hospital sitter who proposed to testify that the testator told her that he and Mrs. Day had an affair and that "I know she's a whore." Whether inadmissible as heresay, as the trial judge ruled, or not, we consider the issue moot because the briefs, and the abridged record, indicate that by perseverance such testimony was ultimately and otherwise elicited in full measure; moreover, we believe this proffered testimony to be cumulative, and its exclusion, even if erroneous, was harmless error.

### V

■ The trial judge allowed the personal representative to testify concerning property values, and allowed the introduction of an inheritance tax return. The alleged prejudice said to result from this action is that the jury would conclude the contestants would receive the vast bulk of the estate, since the will did not dispose of the entire estate. Aside from the fact that we think the personal representative may testify concerning the quantum and quality of the estate, particularly of the assets coming into his hands, See: *State ex rel. Smith v. Livingstone Limestone Co.,* 547 S.W.2d 942 (1977), we are unable to preceive the prejudicial error assigned to the allowance of this proof. The assets of an estate cannot possibly be irrelevant to the trial of an issue *devasit vel non.*

The judgment is affirmed, with costs to appellants.

SANDERS, P.J. (E.S.), and GODDARD, J., concur.

