IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2006 Session

## LAWRENCE LEVINE ET AL. v. RON MARCH ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 02C-3498      D. Randall Kennedy, Judge**

_____

**No. M2006-00297-COA-R3-CV - Filed November 27, 2007**

_____

This appeal involves a dispute over the personal property of a wife who was murdered by her husband. Following their appointment as conservators of her property, the wife's parents filed suit in the Circuit Court for Davidson County against their son-in-law and certain members of his family seeking to recover their daughter's personal property. Following a three-day trial, the jury returned a $222,449.10 verdict for the parents against the husband's brother, sister, and brother-in-law. On this appeal, the husband's family members take issue with the denial of their motion for directed verdict based on the statute of limitations, the failure to join the original conservator as a necessary party, the admissibility of certain evidence, and the jury instructions. We have determined that the trial court did not commit error during the trial and, therefore, affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined. WILLIAM B. CAIN, J., not participating.

Dan R. Alexander, Nashville, Tennessee; and Fletcher W. Long, Springfield, Tennessee; for the appellants, Ron March, Kathy March Breitowich, and Lee Breitowich.

C.J. Gideon, Jr. and Gail Vaughn Ashworth, Nashville, Tennessee, for the appellees, Lawrence Levine and Carolyn Levine.

**OPINION**

**I.**

The mysterious disappearance of Janet March on August 16, 1996 spawned civil and criminal litigation in the state and federal courts of two states that has lasted for the past eleven years. The

criminal litigation has focused on the culpability of Perry March for his wife's death.[1]  The civil litigation, in its various forms, has amounted to a legal battle royale between Mr. March and his wife's parents, Lawrence and Carolyn Levine, over the custody of the March children and over Ms. March's property.  While these disputes have attracted the attention of a national audience, little will be served by recounting all the details again.[2]

This case involves the dispute between the Levines and the members of Mr. March's family regarding the personal property Ms. March left behind in her house on the Blackberry Road, as well as Mr. March's efforts to obtain part of the proceeds of the sale of that house.[3]  In September 1996, approximately one month after his wife's disappearance, Mr. March and his children moved to the Chicago area.  As part of this move, Mr. March, with the help of his father, Arthur March, and his brother, Ron March, removed most of the furnishings and personal property from the house on Blackberry Road and placed them in the house in Illinois in which he and the children were living.  In December 1996, Mr. March and the children moved into a house in Wilmette, Illinois, owned by Dr. Kathy March Breitowich and Lee Breitowich, his sister and brother-in-law.

By this time, the tug-of-war between Mr. March and the Levines over Ms. March's property had begun in earnest.  The Circuit Court for Davidson County had declared Ms. March an absentee and had appointed a conservator for her property.  When the Levines opposed Mr. March's efforts to gain access to Ms. March's and the March children's bank accounts, the trial court joined them as parties in the conservatorship's proceeding.  The court had also stopped the Levines' efforts to foreclose on the Blackberry Road house to prevent it from falling into Mr. March's hands.

In early February 1997, the trial court directed the conservator to sell the Blackberry Road house.  The conservator found a willing buyer, and in late February sought the court's approval to sell the house.  In response, Mr. March hurriedly prepared and recorded five deeds of trust identifying the house as security for pre-existing debts to himself, Arthur March, Ron March, Dr. Breitowich, and Mr. Breitowich.  Mr. March recorded a lien lis pendens based on these deeds of trust.

The deeds of trust and the lien lis pendens clouded the title of the Blackberry Road house and jeopardized its sale.  Accordingly, on April 1, 1997, the trial court struck the encumbrances on the house and transferred the lien lis pendens to the proceeds of the sale of the house.  At this point, the conservator and Mr. March negotiated a settlement of Mr. March's claims to the Blackberry Road

---

[1]Mr. March was eventually indicted for second degree murder, abuse of a corpse, tampering with evidence, conspiracy to commit murder, and theft from the Levine law firm.  On August 17, 2006, he was convicted by a Nashville jury on all charges, and on September 6, 2006, he was sentenced to serve fifty-six years in prison.  Mr. March is currently appealing his convictions.

[2]These details can be found in *March v. Levine*, 249 F.3d 462 (6th Cir. 2001); *March v. Levine*, 136 F. Supp. 2d. 831 (M.D. Tenn. 2001); *In re S.L.M.*, 207 S.W.3d 288 (Tenn. Ct. App. 2006); *March v. Levine*, 115 S.W.3d 892 (Tenn. Ct. App. 2003); *In re Estate of March (Mobley v. Levine)*, No. 01A01-9708-PB-00437, 1999 WL 140760 (Tenn. Ct. App. Mar. 17, 1999) (No Tenn. R. App. P. 11 application filed).

[3]The house was titled in Ms. March's name alone.  She had constructed the house on property that she owned in her own name using her separate funds.

house and the disputed personal property. In return for Mr. March's agreement to drop all of his claims, the conservator agreed that Mr. March would receive a 1996 Volvo, a 1990 Jeep, and $60,000 of the proceeds from the sale of the house. The trial court approved this settlement over the Levines' vehement objections.[4]

The closing on the Blackberry Road house took place in June 1997. Because the lien lis pendens and deeds of trust were still attached to the proceeds of the sale, the conservator sent Mr. March and the members of his family checks to settle their claims to the proceeds of the sale. Dr. Breitowich received $25,000; Mr. Breitowich received $10,000; and Ron March received $10,000.[5]

In addition to the dispute over the house itself, the Levines and Mr. March were at odds over the contents of the Blackberry Road house. The Levines insisted that most of the contents belonged to Ms. March. They also insisted that several items belonged to members of the Levine family. Accordingly, they demanded that the personal property that Mr. March had removed from the house be returned. The trial court permitted the Levines to videotape the contents of the house in Wilmette where Mr. March and the children were living.[6]

On June 27, 1997, the trial court entered an order directing Mr. March to return certain items to the Levines. When Mr. March did not comply, the parties returned to court on August 15, 1997. On August 18, 1997, the conservator sent a letter to Ron March, who at that time was acting as his brother's lawyer, expressing his understanding of the June 27, 1997 order. According to the letter, Mr. March had agreed to turn over certain items of property to the Levines by August 21, 1997. The order also provided that in return for signing a bailment agreement,[7] Mr. March would be permitted to retain most of the personal property taken from the Blackberry Road house as long as he was using it for himself and his children.

---

[4]This court later set the agreement aside after concluding that the Levines had standing to object to the proposed settlement and that the settlement was not justified by the proof. *In re Estate of March (Mobley v. Levine)*, 1999 WL 140760, at *4.

[5]Apparently Mr. March and his father also received a part of the proceeds from the sale of the house. However, the Levines' claims against Mr. March and his father were eventually abandoned.

[6]According to the Levines, the videotape depicted 192 items in the Wilmette house that belonged to Ms. March.

[7]With specific regard to the bailment agreement, the letter stated:

> 2. Perry may keep various items if he signs a Bailment Agreement. These items he may keep are "the Absentee's art work and illustrations in Illinois . . . which March wishes to use and retain at his household for the benefit of himself and the minor children". According to the Order, Mr. March must list with specificity all items he has retained and how they are being used or displayed. Mr. March needs to make this list immediately and provide it to me. The Bailment Agreement is enclosed along with a UCC-1 Statement. Once the list of items Mr. March will retain is agreed upon, that list will be attached to the Bailment Agreement and to the UCC-1.

> 3. Mr. March must also turn over to the Levines all items which originally were in the house on Blackberry and which Mr. March is not using or retaining in his household for the benefit of himself or the minor children, including all items gifted or bequeathed to Janet by her parents or her relatives or obtained by Janet prior to her marriage.

In August 1997 and again in October 1997, the Levines filed petitions in the trial court seeking to hold Mr. March in contempt for failing to return property that he had removed from the Blackberry Road house. On July 15, 1998, the trial court filed a memorandum and order finding Mr. March in civil contempt for failure to deliver certain items of personal property that he had been ordered to turn over to the Levines and imposing Tenn. R. Civ. P. 37 sanctions on Mr. March because of his behavior during a deposition.

In May 1999, Mr. March and the children abruptly left Wilmette, Illinois and moved to a small town in Mexico where Mr. March's father resided. They left behind virtually all the personal property that had been removed from the Blackberry Road house.[8] At this point, the focus of the litigation between Mr. March and the Levines shifted from the property issues to the custody of the March children. The Levines obtained custody of the children in June 2000, but in April 2001, the federal courts ordered them to return the children to Mr. March in Mexico.

After Mr. March and the children moved to Mexico, the Levines apparently inspected the personal property that had been left behind in the house owned by the Breitowiches. In mid-1999, Dr. Breitowich sold Ms. March's 1996 Volvo and used the proceeds to pay off some of Mr. March's debts. In October 1999, the Breitowiches also sold the house in Wilmette in which Mr. March and the children had been living. Ron March and the Breitowiches stored the contents of the house in a forty-foot storage trailer. In February 2000, they divided up the items in the trailer between themselves and either gave away or discarded the rest. They did not consult with or inform either the conservator or the Levines regarding their actions.

The original conservator withdrew from the case, and on December 19, 2001, the trial court appointed the Levines as the successor conservators of Ms. March's property. In a telephone call with Dr. Breitowich on July 29, 2002, Ms. Levine requested information regarding the location of the property that had been in Mr. March's house when he moved to Mexico. Dr. Breitowich's answers were vague and evasive. She did not provide direct answers to Ms. Levine's questions regarding the location of the property, and she eventually suggested that Ms. Levine should talk with Ron March. Dr. Breitowich did not tell Ms. Levine that she had placed Ms. March's custom-made granite table, six chairs, and artwork in her own house or that Ron March had taken a television set, a wooden table, couches, pictures, chairs, ottomans, and corner cabinets that had been in the Blackberry Road house.

On August 19, 2002, the Levines' lawyer mailed certified letters to Ron March and the Breitowiches requesting them to return the furniture that Mr. March had left behind when he moved to Mexico and the portions of the proceeds from the sale of the Blackberry Road house they had received in June 1997. On December 6, 2002, after receiving no response to their letters, the Levines filed suit in the Circuit Court for Davidson County against Mr. March and his family[9] seeking to

---

[8]In a letter dated July 13, 1999, Mr. March informed the conservator that he was living in Mexico and that "[n]o property on your list has been removed from Illinois, and I am in compliance with our Bailment Agreement."

[9]In addition to Mr. March, the Levines named Arthur March, Ron March, the Breitowiches, and Mr. Breitowich's company as defendants. Apparently Mr. March and Arthur March were not served with process because they were residing in Mexico. The Levines never pursued their claims against Mr. March and Arthur March even

(continued...)

-4-

recover the property and sale proceeds.[10]  Ron March and the Breitowiches filed a joint answer in April 2003.  In general terms, they denied that they had destroyed or converted any property belonging to Ms. March or to the Levines or that they had engaged in champerty.  In addition, they asserted affirmative defenses based on lack of jurisdiction, laches, statute of limitations, ripeness, estoppel, accord and satisfaction, estoppel, and failure to join the original conservator as a party.

The case was tried to a jury from September 19 through 22, 2005.  Neither Mr. March nor Arthur March participated in the trial, and the trial court informed the prospective jurors at the outset that the Levines were not seeking a judgment against Mr. March or Arthur March, even though they were named as defendants in the complaint.  At the close of their case-in-chief, the Levines announced that they were voluntarily dismissing their claims against Mr. March and Arthur March without prejudice.

The jury returned a verdict for the Levines, as conservators of their daughter's property, on their claims of fraud, champerty, destruction of personal property, and conversion against Ron March and the Breitowiches.  The jury also returned a verdict against Ron March on the fraudulent conveyance claim.  The jury determined that the damages amounted to $134,650 and that the defendants should be required to pay prejudgment interest at the rate of ten percent per annum from March 27, 1999.  On October 3, 2005, the trial court entered a judgment against Ron March and the Breitowiches, jointly and severally, for $222,449.10.  Following the denial of their motion for a new trial on January 10, 2006, Ron March and the Breitowiches perfected this appeal.

## II.
### THE TIMELINESS OF THE CLAIMS INVOLVING MS. MARCH'S PERSONAL PROPERTY

The first issue we address involves the timeliness of the Levines' claims regarding the conversion and destruction of their daughter's personal property.  Both parties agree that these claims are governed by the three-year statute of limitations in Tenn. Code Ann. § 28-3-105 (2000).  However, the Breitowiches and Ron March insist that the trial court erred by concluding that these claims were timely.  The Levines disagree.  We have determined that the Levines have the better argument.

### A.

Claims involving injuries to or conversion of personal property must be filed within three years after the cause of action accrues.  Tenn. Code Ann. § 28-3-105(1), (2).  For the purposes of this statute of limitations, a cause of action accrues either when the wrongful act occurs or when the plaintiff discovers, or in the exercise of reasonable care and diligence should have discovered, that

---

[9](...continued)
though they were named as defendants.

[10]The Levines' theories of recovery with regard to Ms. March's property included (1) monies had and received, (2) fraud, (3) fraudulent conveyance, (4) champerty, (5) destruction of personal property, and (6) conversion and trover. They also asserted claims regarding their own property on the theories of destruction, conversion, and trover.  The Levines also included a claim for civil conspiracy.

it has suffered an injury and the cause of the injury. *See Damron v. Media Gen., Inc.*, 3 S.W.3d 510, 512 (Tenn. Ct. App. 1999); *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996). Under the discovery rule, the statute of limitations is tolled only during the period of time when the plaintiff has no actual knowledge of the injury and, as a reasonable person, would not be placed on inquiry notice. *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680-81 (Tenn. 1990). However, the discovery rule does not permit a plaintiff to delay filing suit until all the injurious effects or consequences of the alleged tortious conduct are fully known. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 533 (Tenn. 1998); *Wyatt v. A-Best Co.*, 910 S.W.2d 851, 855 (Tenn. 1995); *Northeast Knox Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 460-61 (Tenn. Ct. App. 2006).

The running of a statute of limitations may also be tolled when a defendant engages in conduct intended to conceal an injury from the plaintiff. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001); *Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977). Plaintiffs seeking to take advantage of fraudulent concealment tolling must establish (1) that the defendant affirmatively concealed the cause of action or remained silent and failed to disclose material facts despite a duty to do so, (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence, (3) that the defendant had knowledge of the facts giving rise to the cause of action, and (4) that the defendant concealed material facts from the plaintiff by withholding information or making use of some device to mislead the plaintiff or by failing to disclose information when he or she had a duty to do so. *Shadrick v. Coker*, 963 S.W.2d 726, 735-36 (Tenn. 1998); *Sibley v. McCord*, 173 S.W.3d 416, 420 (Tenn. Ct. App. 2004).

**B.**

Under the terms of the 1997 bailment agreement, Mr. March was entitled to retain most of the items of personal property removed from the Blackberry Road house as long as he was using them "for the benefit of himself and the minor children." He was required to return property to the Levines only when he was "not using or retaining [them] in his household for the benefit of himself or the minor children." Thus, no conversion of the property could occur until Mr. March was no longer retaining the property in his household for his and the children's benefit.

Mr. March left the Chicago area and moved to Mexico in May 1999. He left the disputed items of property behind in the house owned by the Breitowiches. The Levines knew shortly after Mr. March moved to Mexico that he had left the property behind because they personally inspected the contents of the house in which he and the children had been living. In addition, on July 13, 1999, Mr. March informed the conservator not only that he and the children had moved to Mexico but also that no property had been removed from Illinois. Accordingly, by no later than mid-July 1999, the Levines had actual notice that Mr. March was no longer in compliance with the bailment agreement and was obliged by virtue of the June 27, 1997 order to return the property he had taken from the Blackberry Road house.

Despite their knowledge that Mr. March had left the disputed property behind when he moved to Mexico in May 1999, the Levines did not file suit against Mr. March and his family to regain the property until December 6, 2002. The Levines now argue that the running of the statute of limitations was tolled because Mr. March, Ron March, and the Breitowiches concealed the

location and fate of the property from them. However, "fraudulent concealment" tolling is not available to the Levines with regard to their claims against Mr. March because neither Mr. March nor any member of his family undertook to conceal that Mr. March did not take the disputed property to Mexico or that Mr. March was no longer retaining the property in his household for the use and the benefit of himself and the minor children. While Dr. Breitowich may very well have lied to Ms. Levine during their June 29, 2002 telephone conversation about the fate of the furniture and the 1996 Volvo, the Levines knew as early as May 1999 that Mr. March was no longer entitled to possession of the property he had left behind in Illinois. In light of this knowledge, the Levines' reliance on "fraudulent concealment" tolling with regard to their claims against Mr. March must fail.

## C.

The Levines' claims against Ron March and the Breitowiches do not necessarily meet the same fate as their claims against Mr. March. Ron March and the Breitowiches engaged in separate tortious conduct, and thus the timeliness of the Levines' claims against them must be addressed separately from the timeliness of the claims against Mr. March. We have determined that the trial court correctly held that the Levines' claims against Ron March and the Breitowiches were timely.

Mr. March's conversion occurred in May 1999 when he moved to Mexico and failed to return the property as required by the June 27, 1997 order. Neither Ron March nor the Breitowiches were parties to the litigation, and thus they were not bound by that order in the same way that Mr. March was. They owed no direct obligation to the conservator of Ms. March's estate or to the Levines. However, they were aware of the conditions under which Mr. March had been permitted to retain possession of the property taken from the Blackberry Road house. After all, Ron March had been representing his brother in the very proceeding that produced the June 27, 1997 order.

In October 1999, Ron March and the Breitowiches exercised dominion and control over the property that Mr. March had left behind by removing it from the house in Wilmette and placing it in a storage trailer. In February 2000, despite their knowledge that Mr. March should have returned the property to the conservator, Ron March and the Breitowiches converted certain pieces of property by removing them from the trailer and placing them in their own houses. They also destroyed or discarded the remaining items of property they did not want.

While the Levines knew that Mr. March had failed to return the property when he moved to Mexico, they had no knowledge regarding the fate of the property after the Breitowiches sold the house in Wilmette in October 1999. They certainly did not know, nor did they have reason to know, that in February 2000, Ron March and the Breitowiches had taken some of the property for themselves and had destroyed or discarded the rest. When Ms. Levine telephoned Dr. Breitowich on July 29, 2002 to ask her to return the property that Mr. March had left behind, Dr. Breitowich lied about her knowledge regarding what had happened to the property.[11]

When Ron March and the Breitowiches failed to account for the property or to respond to their August 19, 2002 letter requesting the return of the property, the Levines included them as

_____

[11]Dr. Breitowich told Ms. Levine repeatedly that she had none of the property that Mr. March had left behind and that she had "no idea where anything is, where any of it went or anything like that."

defendants in a suit filed on December 6, 2002 seeking damages for the conversion or destruction of the property that Mr. March had left behind. The acts upon which the Levines' claims against Ron March and the Breitowiches are based occurred in February 2000 when they converted the property to their own use and discarded or destroyed the rest. Thus, the Levines' December 6, 2002 claims against Ron March and the Breitowiches were timely because they were filed within three years of February 2000.[12]

## III.
### THE TIMELINESS OF THE CLAIMS INVOLVING THE PROCEEDS FROM THE SALE OF THE BLACKBERRY ROAD HOUSE

The Levines also sought to recover the proceeds from the sale of the Blackberry Road house that had been paid to Ron March and the Breitowiches as a result of the deeds of trust recorded by Mr. March on March 13, 1997. They claimed that these deeds of trust were champertous and, therefore, that Ron March and the Breitowiches had no legally recognizable claim in the Blackberry Road house or the proceeds from its sale. In addition to their general denial that the deeds of trust were champertous, Ron March and the Breitowiches asserted that the Levines' champerty claim was time-barred. The trial court determined that the claims were timely, and we agree.

Tennessee champerty statutes prohibit the sale of pretended interests in real property. Tenn. Code Ann. § 66-4-201 (2004).[13] They also include the presumption that a sale of any interest in real property by a person without actual or constructive possession of the real property is champertous. Tenn. Code Ann. § 66-4-205 (2004). The purpose of these statutes is to protect persons in actual possession of an interest in real property from suits based on pretended or dormant claims, unless the suits are instituted in good faith by persons with bona fide claims of title. *Williams v. Hogan*, 19 Tenn. (Meigs) 187, 189 (1838).

A deed of trust is a conveyance of an interest in real property to secure a debt. *Bidwell v. Paul*, 64 Tenn. 693, 694 (1875). It is a three-party arrangement in which the borrower conveys title to an interest in real property to a third party to hold for the benefit of the lender until repayment of the loan. Because a deed of trust conveys an "interest" in land for the purpose of Tenn. Code Ann. § 66-4-201, a deed of trust may be champertous. *Knox v. Keith*, 9 Tenn. App. 614, 616 (1929); R. D. Cox, *Champerty As We Know It*, 13 Mem. St. L. Rev. 139, 182 n.200 (1983).

Lawsuits or legal claims based on champertous deeds are subject to dismissal. Tenn. Code Ann. § 66-4-203 (2004). Parties who have been harmed by a champertous transaction may seek to set aside the conveyance or to recover damages or both. *See Gheen v. Osborne*, 58 Tenn. (11 Heisk.)

---

[12]Had Ron March and the Breitowiches argued that they actually converted the disputed property in October 1999 when they removed it from the Wilmette house and placed it in a storage trailer, the trial court would have been justified in finding that the running of the statute of limitations was tolled beginning on July 29, 2002, when Dr. Breitowich fraudulently concealed the fate of the disputed property from Ms. Levine.

[13]This statute can trace its lineage at least as far back as 32 Henry VIII, ch. 9 (1540). *Robertson & Hobbs v. Cayard*, 111 Tenn. 356, 363, 77 S.W. 1056, 1058 (1903); *Douglass v. Wood's Lessee*, 31 Tenn. (1 Swan) 393, 394 (1852). Tennessee is among the handful of states that continue to recognize this species of champerty.

61, 66 (1872). These claims are governed by the six year statute of limitations in Tenn. Code Ann. § 28-3-109(1) (2000). *Kitchen-Miller Co. v. Kern*, 170 Tenn. 10, 17-18, 91 S.W.2d 294, 294 (1936).

The deeds of trust prepared by Mr. March in March 1997 were clearly champertous because Mr. March had no legal interest in the Blackberry Road house at the time. Setting aside these deeds of trust was no longer a viable remedy after June 1997 because by that time Ron March and the Breitowiches had received payments from the proceeds of the sale of the house. Accordingly, the Levines' lawsuit seeking to recover these payments, having been filed in December 2002, was well within the applicable six-year statute of limitations.

## IV.
### THE ABSENCE OF MS. MARCH'S ORIGINAL CONSERVATOR AS A PARTY

Ron March and the Breitowiches assert that the trial court erred by declining to join the original conservator of Ms. March's estate as a party. They insist that the conservator was a necessary party for the purpose of Tenn. R. Civ. P. 19.01 because his testimony regarding their claimed right to the property differed from theirs and because his presence was indispensable to their claim that they were holders in due course of the champertous deeds of trust prepared by Mr. March. These arguments have no merit.

Tenn. R. Civ. P. 19.01 requires persons subject to the trial court's jurisdiction to be joined as parties if their absence will prevent providing complete relief to a person who is already a party or if the persons claim an interest in the subject of the litigation. Ms. March's original conservator has never claimed a personal interest in the subject of the litigation, and the interests that he asserted on behalf of Ms. March while he was her conservator are now being asserted by the Levines who are parties to the litigation. Therefore, Ron March's and the Breitowiches' assertion that Ms. March's original conservator is an indispensable party stands or falls on whether his presence was required to enable them to assert their holder in due course claim.

There are three reasons why Ms. March's original conservator was not indispensable to Ron March's and the Breitowiches' holder in due course claim. First, the deeds of trust were champertous and, therefore, cannot support any claim. Second, the holder in due course doctrine does not apply to any of the disputed property in this case.[14] Third, the mere fact that one person's version of events differs from another's version of events does not require that the person be joined as a party. As in this case, the person may participate in the trial as a witness, and his or her version of the events may be tested through examination and cross-examination. The Levines called Ms. March's original conservator as a witness, and both Ron March and the Breitowiches cross-examined him extensively regarding their various theories. Requiring Ms. March's conservator to participate in this case as a party would have added nothing to Ron March's and the Breitowiches' ability to defend themselves.

## V.

---

[14]The holder in due course doctrine applies only to negotiable instruments. Deeds of trust are not, in and of themselves, negotiable instruments. *See Carson v. McNeal*, 375 F. Supp. 2d 509, 516 n.10 (S.D. Miss. 2005). Of course the various items of Ms. March's personal property were not negotiable instruments either.

### THE USE OF THE VIDEO DEPOSITION OF MR. MARCH

Ron March and the Breitowiches take issue with the trial court's decision to permit the Levines to play a 21-minute videotaped deposition of Mr. March to the jury. They insist that the trial court committed reversible error because Mr. March was wearing prison garb when he gave the deposition and because his answers to most of the questions posed to him were assertions of his Fifth Amendment privilege against self-incrimination. These arguments likewise fail.

Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion. *Dockery v. Bd. of Prof'l Responsibility*, 937 S.W.2d 863, 866 (Tenn. 1996). The trial court must exercise its discretion in light of Tenn. R. Evid. 402 which reflects the policy that all evidence meeting the test of relevancy in Tenn. R. Evid. 401 is admissible unless otherwise excluded on some appropriate ground. *Phillips v. F. W. Woolworth Co.*, 867 S.W.2d 316, 318 (Tenn. Ct. App. 1992). One ground for excluding otherwise relevant evidence is that its probative value is outweighed by the danger of unfair prejudice, confusion, misleading the jury, or unnecessary delay. Tenn. R. Evid. 403. Excluding otherwise relevant evidence under Tenn. R. Evid. 403 is an extraordinary step that should be used sparingly. Relevant evidence should be admitted if the balance between its probative value and its possible prejudicial effects is close. *Richardson v. Miller*, 44 S.W.3d 1, 21 (Tenn. Ct. App. 2000).

The arguments presented by Ron March and the Breitowiches regarding the admission of Mr. March's deposition are undermined by two fatal shortcomings. The first shortcoming involves the appellate record. Neither the videotape nor a transcript of the videotape has been included in this record. Parties have the responsibility to see to it that the record contains the evidence necessary to support their arguments on appeal. Where the record is incomplete and does not contain a transcript of the relevant portion of the proceedings or the portions of the record upon which the party relies, an appellate court cannot consider the issue. Tenn. R. App. P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993); *Davis v. Tennessean*, 83 S.W.3d 125, 127 n.2 (Tenn. Ct. App. 2001).

The second shortcoming involves the legal standard used to review a trial court's decisions regarding the admission or exclusion of evidence. Ron March and the Breitowiches have misapprehended the standard used to review a trial court's decision to admit relevant evidence in a civil case. They rest their claim that the trial court committed error in this case entirely on *State v. Sanlin*, No. W2004-00841-CCA-R3-CD, 2005 WL 1105227 (Tenn. Crim. App. May 6, 2005) (No Tenn. R. App. P. 11 application filed) which held that the trial court in a criminal case erred by permitting the prosecution to call a co-defendant as a witness, knowing that the co-defendant would claim his privilege against self-incrimination. The appropriate standard of review in a civil case requires the appellate court to analyze the trial court's decision to admit the evidence using the principles associated with Tenn. R. Evid. 403. Because the record does not contain the disputed evidence, this court cannot undertake a meaningful review of this question. Because Ron March and the Breitowiches are responsible for this omission, their challenge to the trial court's admission of Mr. March's videotaped deposition must fail.

## VI.
### CAROLYN LEVINE'S VALUATION TESTIMONY

Ron March and the Breitowiches assert that the trial court erred by permitting Carolyn Levine to state her opinion with regard to the value of many items of personal property that Mr. March removed from the Blackberry Road house. They insist that this testimony violates Tenn. R. Evid. 701(b) because Ms. Levine was not the owner of the property. This argument, too, must fail due to the appellants' inaction and their misapprehension of the applicable legal principles.

Over the course of two days, and without objection by either Ron March or the Breitowiches, Ms. Levine testified regarding the value of the disputed property. In fact, Ron March and the lawyer representing the Breitowiches extensively cross-examined Ms. Levine regarding her opinions concerning the value of the property. It was only after Ms. Levine had completed her testimony and had left the stand that Ron March and the Breitowiches objected to her valuation testimony.

The contemporary objection rule is an elementary principle of trial practice. Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). Parties cannot obtain relief on appeal from an alleged error they could have prevented. Tenn. R. App. P. 36(a). Therefore, failing to make an appropriate and timely objection to the admission of evidence in the trial court prevents a litigant from challenging the admission of the evidence on appeal. *Welch v. Bd. of Prof'l Responsibility*, 193 S.W.3d 457, 464 (Tenn. 2006); *State ex rel. Smith v. Livingstone Limestone Co.*, 547 S.W.2d 942, 944 (Tenn. 1977); *Ottinger v. Stooksbury*, 206 S.W.3d 73, 78 (Tenn. Ct. App. 2006). Because Ron March and the Breitowiches failed to make a timely objection to Ms. Levine's testimony, they cannot take issue with this testimony on appeal.[15]

## VII.
### THE JURY INSTRUCTIONS

Ron March and the Breitowiches mount two assaults on the jury instructions. First, they insist that the trial court erred by instructing the jury that it could draw an adverse inference against them based on Mr. March's invocation of his Fifth Amendment privilege. Second, they insist that the trial court erred by giving the jury a correct instruction regarding the definition of marital property because it had not been included in the proposed instructions submitted to the parties prior to closing argument. We have concluded that the trial court's instructions do not contain reversible error.

### A.
### The Adverse Inference Instruction

### 1.

---

[15] Were we to consider the substance of this issue, we would quickly conclude that the conservator of an absent or deceased party's property stands in the shoes of the absent or deceased party and, therefore, may testify with regard to the value of the absent or deceased party's property under Tenn. R. Evid. 701(b). *Reynolds v. Day*, 792 S.W.2d 924, 928 (Tenn. Ct. App. 1990), *rev'd on other grounds*, *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995) (permitting the personal representative of a decedent to testify concerning the value of the decedent's property); *Crail v. Blakely*, 505 P.2d 1027, 1035 n.7 (Cal. 1973) (holding that the administrator of an estate possessed sufficient personal knowledge to give an opinion regarding the value of the decedent's property).

-11-

The essence of the Levines' claims against Ron March and the Breitowiches was that they had converted or destroyed personal property belonging to Ms. March and that they had participated in a civil conspiracy with Mr. March to convert this property. The essence of the defenses put forward by Ron March and the Breitowiches was that they neither converted nor destroyed anything that belonged to Ms. March because the disputed property had been abandoned by Ms. March's original conservator and actually belonged to Mr. March. Thus, Mr. March's claimed interest in the disputed property and the alleged abandonment of the disputed property by Ms. March's original conservator were at center stage during the trial.

The Levines presented a number of witnesses who testified about the role that Mr. March and the members of his family played in drafting the deeds of trust and placing the lien lis pendens on the Blackberry Road house, in moving the disputed property to Illinois, and in disposing of the property after Mr. March moved to Mexico. This evidence showed that Mr. March had been directly involved in the preparation of the deeds of trust and the lien lis pendens that benefitted the members of his family, that the members of his family had assisted him in removing the disputed property from the Blackberry Road house and transporting it to Illinois, and that Mr. March had actively participated in the dealings with Ms. March's conservator and the probate court regarding the disputed property – even to the extent of signing Ron March's name to letters and pleadings.

The Levines also called both Ron March and Dr. Breitowich as adverse witnesses and asked them to explain how they assisted their brother following Ms. March's disappearance. They acknowledged their roles in moving the disputed property from the Blackberry Road house to Illinois, their awareness of the deeds of trust prepared by Perry March to enable them to share in the proceeds from the sale of the Blackberry Road house, and their roles in the disposition of the disputed property following Mr. March's move to Mexico. Both Ron March and Ms. Breitowich stated repeatedly that they were simply following Mr. March's instructions with regard to the disputed property.

Following the testimony of Ron March and Dr. Breitowich, the Levines introduced into evidence Mr. March's 21-minute videotaped deposition. While neither the videotape nor a transcript of its contents are part of this record, Mr. March apparently repeatedly invoked his Fifth Amendment privilege against self-incrimination in response to most questions regarding his claims to the disputed property and the role he and his family members played in its disposal and distribution after he moved to Mexico. In response to the objections to the introduction of the videotape, the Levines explained that the jury should be permitted to draw adverse inferences against Ron March and the Breitowiches from Mr. March's refusal to explain his role with regard to the disputed property because they had repeatedly justified their conduct by testifying that they were simply carrying out Mr. March's instructions.

When the trial court reviewed its proposed jury instructions with the parties, it informed them that it intended to include an instruction permitting the jury to draw an adverse inference against Ron March and the Breitowiches based on Mr. March's assertion of his privilege against self-incrimination. While Ron March and the Breitowiches conceded that the jury could draw an adverse inference against Mr. March himself, they insisted that the jury should not be permitted to draw an adverse inference against them. The trial court took a different view and included the following in its instructions to the jury:

> You've also seen a deposition in which the Fifth Amendment
> has been utilized as a response. Since this is a civil cause of action,
> you may draw an adverse inference against a party where Perry
> March claimed the Fifth Amendment to avoid self-incrimination.

In their motion for new trial and again on appeal, Ron March and the Breitowiches take issue with this instruction.

**2.**

Comments regarding a criminal defendant's exercise of his or her Fifth Amendment rights are strictly prohibited by the federal and state constitutions.[16] However, the invocation of the Fifth Amendment privilege in civil cases between private parties calls into play considerations quite different from those pertinent in a criminal case. The United States Supreme Court has determined that there is no constitutional impediment to drawing an inference against a party invoking his or her Fifth Amendment privilege in a civil case. *Baxter v. Palmigano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976); Robert Heidt, *The Conjurer's Circle – The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1110-12 (1982). Accordingly, the majority of jurisdictions, including Tennessee, permit fact-finders to draw adverse inferences against parties who invoke their Fifth Amendment rights in civil case. *See Rachels v. Steele*, 633 S.W.2d 473, 476 (Tenn. Ct. App. 1981); VIII John H. Wigmore, *Evidence* § 2272, at 439 (McNaughton rev. 1961).

Ron March and the Breitowiches do not disagree with these principles. However, they insist that it is improper to permit adverse inferences arising from the invocation of a person's Fifth Amendment privilege against anyone other than the person asserting the privilege. Accordingly, we must determine whether an adverse inference against a person other than the person invoking his or her Fifth Amendment privilege is trustworthy and will advance the search for the truth. *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997). Rather than adopting a per se approach to this question, we have determined that it must be answered on a case-by-case basis.

The legal principles governing the propriety of permitting a negative inference to be drawn from a person's exercise of his or her privilege against self-incrimination vary depending on whether the person is a party or non-party. Thus, we must determine at the outset whether Mr. March should be considered a party or a non-party to this litigation. While his status changed during the course of the litigation, we have determined that he should be considered to be a non-party for the purposes of addressing this evidentiary question.

Mr. March was a named defendant in the complaint filed by the Levines, and the Levines sought specific relief against him. However, at least as far as the record shows, Mr. March was never served with process, even after he was returned to Nashville following his extradition from Mexico. Mr. March never sought dismissal of the complaint for failure of service of process, and at one point during discovery, entered an appearance to contest the taking of his video deposition. However, when the trial started, the trial court informed the prospective jurors that the Levines were

---

[16]*Griffin v. California*, 380 U.S. 609, 612, 85 S. Ct. 1229, 1232 (1965); *State v. Hale*, 672 S.W.2d 201, 202-03 (Tenn. 1984); *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).

not pursuing any claims against Mr. March. At the conclusion of their case-in-chief, the Levines took the formal step of announcing that they were voluntarily dismissing their claims against Mr. March. Based on these facts, Mr. March was, for all intents and purposes, a non-party in this case.

A non-party's invocation of its privilege against self-incrimination in a civil proceeding implicates Fifth Amendment concerns to even a lesser degree than a party's invocation of the privilege. *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275-76 (3d Cir. 1984). However, over twenty years ago, this court stated almost off-handedly in dicta that "no such [adverse] inference may be drawn from a claim of privilege by a witness." *Marzo v. Marzo*, No. 917, 1984 Tenn. App. LEXIS 2594, at *7 (Tenn. Ct. App. Jan. 5, 1984) (No Tenn. R. App. P. 11 application filed).[17] We respectfully decline to follow the categorical conclusion of *Marzo v. Marzo* in this case because subsequent case law provides sound analytical principles for determining when a fact-finder may be permitted to draw an adverse inference against a party based on a witness's decision to invoke his or her Fifth Amendment privilege.

The prevailing authority today is that the admissibility of a non-party's invocation of its Fifth Amendment privilege against self-incrimination should be analyzed using the balance test in Fed. R. Evid. 403 and its state counterparts, *Brink's, Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983), and that questions regarding admissibility should be decided on a case-by-case basis. *FDIC v. Fidelity & Deposit Co.*, 45 F.3d 969, 978 (5th Cir. 1995); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1581 (8th Cir. 1987); *Brink's, Inc. v. City of New York*, 717 F.2d at 708. The United States Court of Appeals for the Second Circuit has identified four "non-exclusive factors" to be used when considering whether it is permissible to permit a fact-finder to consider an adverse inference arising from a non-party's invocation of his or her Fifth Amendment privilege. *LiButti v. United States*, 107 F.3d at 123. These four factors include:

> 1. *The Nature of the Relevant Relationships:* While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a non-party witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.
>
> 2. *The Degree of Control of the Party Over the Non-Party Witness:* The degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the

---

[17]The court cited no legal support for its conclusion other than an editorial comment included by Professor Wigmore in his analysis of *Bradley v. O'Hare*, 156 N.Y.S.2d 533, 540 (App. Div. 1956) which had held the adverse inference arising from a witness's invocation of its Fifth Amendment privilege could be attributed to a party. VIII John H. Wigmore, *Evidence* § 2272, at 439 n.14. The court concluded that the Appellate Division's use of the word "witnesses" must have been an "inadvertence." However, later decisions by the Appellate Division have confirmed that the reference to "witnesses" was intentional. *Searle v. Cayuga Med. Ctr.*, 813 N.Y.S.2d 552, 555 (App. Div. 2006) (holding that the adverse inferences arising from a non-party's invocation of its Fifth Amendment privilege may be attributed to a party).

privilege should be viewed as akin to testimony approaching admissibility under Fed. R. Evid. 801(d)(2), and may accordingly be viewed . . . as a vicarious admission.

3. *The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation:* The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation.

4. *The Role of the Non-Party Witness in the Litigation:* Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court.

*LiButti v. United States*, 107 F.3d at 123-24. Other jurisdictions have recognized the validity of these factors. *Desrosiers v. Henne*, 926 A.2d 1024, 1028 n.6 (Conn. 2007); *Lentz v. Metro. Prop. & Cas. Ins. Co.*, 768 N.E.2d 538, 542-43 (Mass. 2002).

### 3.

The trial court stated both during the trial and in its ruling on the motion for a new trial that it had weighed the *LiButti* factors along with other factors and had determined that the jury in this case should be permitted to draw an adverse inference against Ron March and the Breitowiches from Mr. March's invocation of his Fifth Amendment privilege against self-incrimination. We can find no fault with the trial court's analysis.

Mr. March is a central figure in this case. He initiated and ostensibly controlled all of his family's actions with regard to the disputed property. According to Ron March and the Breitowiches, virtually every action they took with regard to the disputed property was done at Mr. March's instruction and in reliance on Mr. March's claimed interest in this property. Thus, the evidence paints a picture of a group of family members with close personal ties acting in accordance with one family member's directions. The interests of these family members with regard to the Levines' claims in this case are identical, and thus one family member's invocation of his Fifth Amendment privilege against self-incrimination would have advanced the interests of the other members of his family who were apparently following his directions. In these circumstances, permitting an adverse inference to be drawn against Ron March and the Breitowiches based on Mr. March's assertion of his Fifth Amendment privilege against self-incrimination was permissible and would have aided the fact-finder's search for the truth.

### B.
### The Supplemental Instruction Defining "Marital Property"

-15-

During their closing arguments, both Ron March and the lawyer for the Breitowiches apparently told the jury that Mr. March was entitled to exercise control over the disputed property because it was marital property.[18]  Following the closing arguments, the Levines insisted that the definition of "martial property" relied on by Ron March and the Breitowiches' lawyer was incorrect and requested the trial court to give a supplementary instruction containing a correct definition of marital property.  The Breitowiches' lawyer complained that he had been ambushed, and both Ron March and the Breitowiches' lawyer insisted that giving the requested instruction would be unfair and prejudicial.

The trial court, noting that jury instructions may be given before or after closing argument, stated that it had an obligation to "make sure that [the] charge is not misleading or in any way adversely impacts the application of the appropriate law that the jurors must consider."  Accordingly, the trial court included in its instructions to the jury the following instruction:

> Ladies and gentlemen, property acquired by spouses during marriage does not automatically become marital property simply because it was acquired during marriage.  The parties must first request the Court to divide the property as part of a formal divorce proceeding. "Marital property" and "jointly owned property" are not equivalent terms.[19]

Ron March and the Breitowiches do not assert that this instruction misstates the law. However, they now insist that Tenn. R. Civ. P. 51 does not permit any jury instructions following closing arguments that have not been reviewed by the parties prior to closing arguments except instructions concerning organizational and related matters and that the challenged instruction does not involve an organizational or related matter.  We find little merit in this interpretation of Tenn. R. Civ. P. 51.

Lawyers have considerable latitude during their closing arguments to discuss their version of the conclusions that can be drawn from the proven facts.  *Rogers v. Murfreesboro Hous. Auth.*, 51 Tenn. App. 163, 173, 365 S.W.2d 441, 446 (1962).  They are also entitled to give a reasonable and proper explanation of the law applicable to the case.  *See Zang v. Leonard*, 643 S.W.2d 657, 666 (Tenn. Ct. App. 1982).  They are not, however, entitled to misstate the law in their closing arguments.

Because the appellate record does not contain a transcript of the lawyers' closing arguments, we are unable to examine the closing arguments on behalf of Ron March and the Breitowiches to determine whether, in fact, they contain erroneous or misleading definitions of "marital property." In the absence of a record, we must presume that the arguments, in fact, contained legally erroneous definitions of marital property.  Thus, the question we must answer is whether Tenn. R. Civ. P. 51 prevents a trial court from giving a curative instruction in its charge to the jury after a party's lawyer

---

[18]The record on appeal does not contain the closing arguments.

[19]The trial court drew this instruction from *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 593 (Tenn. 1994).

has made a closing argument that contains an erroneous, misleading statement of law. The answer, of course, is that it does not.

The Levines took issue with the legal misstatements regarding the definition of marital property. Out of the jury's presence, they promptly called the trial court's attention to the legal misstatements and requested the trial court to cure the error by including the correct definition of "marital property" in its instructions to the jury. The trial court agreed that Ron March's and the Breitowiches' closing arguments contained an erroneous definition of "marital property." Rather than adopting the supplemental instruction proposed by the Levines, the court fashioned its own definition of marital property and included it in the instructions in a way that was calculated not to call undue attention to the instruction. We have concluded that the trial court's response to the legal errors in the closing arguments on behalf of Ron March and the Breitowiches was appropriate.[20]

## VIII.
### THE CUMULATIVE ERROR ARGUMENT

As a final matter, Ron March and the Breitowiches assert that the cumulative effect of all the errors committed by the trial court prevented them from presenting a fair and meaningful defense. We need not tarry long with this omnibus argument because, after addressing all the issues Ron March and the Breitowiches have raised on appeal, we have concluded that the trial court did not commit any reversible errors during this trial. The cumulative effect of the manner in which the trial court tried this case is simply an affirmance of the judgment.

## IX.

The judgment is affirmed, and the case is remanded to the trial court for whatever further proceedings consistent with this opinion may be required. The costs of this appeal are taxed, jointly and severally, to Ron March, Kathy March Breitowich, and Lee Breitowich and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[20]Neither Ron March nor the Breitowiches argue that the trial court erred by failing to give them an opportunity to make additional closing arguments after the trial court decided to add a charge defining "marital property" to its instructions. With good reason. Tenn. R. App. P. 36(a) prevents them from raising this issue on appeal because they did not ask the trial court for an opportunity to make additional closing arguments.