# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 8, 2013 Session

## TERESA VINCENT v. JERRY S. JOHNSTON, SR.

**Appeal from the Chancery Court for McMinn County**
**No. 2011-CV-457      Jerri S. Bryant, Chancellor**

_____

**No. E2013-00588-COA-R3-CV-FILED-JANUARY 24, 2014**

_____

This boundary line dispute involves a five-acre parcel of real property ("Disputed Property") in McMinn County to which the petitioner and respondent, who own adjoining parcels, both claim ownership. The petitioner filed a petition to quiet title, requesting that she be declared the owner of the Disputed Property, and for declaratory judgment as to damages she claimed as a result of the respondent's alleged trespass, encroachment, and harvesting of timber. The respondent filed a counter-petition, alleging that he was the rightful owner of the Disputed Property; raising affirmative defenses of waiver/estoppel, champerty, and adverse possession; and requesting damages for the petitioner's alleged encroachment and destruction of boundary markers. Following a bench trial, the trial court declared the petitioner the owner of the Disputed Property, dismissed the respondent's counter-petition, and dismissed all claims for damages. The respondent appeals. We affirm the trial court's finding that title to the Disputed Property is vested in the petitioner. We determine, however, that the respondent has established the statutory defense of adverse possession, pursuant to Tennessee Code Annotated § 28-2-103 (2000), only to the extent that certain improvements encroach upon the Disputed Property, and we reverse upon this ground. We remand to the trial court for determination as to the extent of the encroachments. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Andrew J. Brown, Cleveland, Tennessee, for the appellant, Jerry S. Johnston, Sr.

Travis D. Henry, Cleveland, Tennessee, for the appellee, Teresa Vincent.

# OPINION

## I. Factual and Procedural Background

The petitioner, Teresa Vincent, purchased 122.8 acres in McMinn County ("Vincent Property"), which were conveyed to her in fee simple via warranty deed from Bowater, Inc. ("Bowater") dated February 5, 2010, and recorded in the Register's Office for McMinn County in Plat Cabinet A, Slide 21B on September 16, 2010. Ms. Vincent's deed incorporated the property description from a survey prepared by William D. McKenzie, Registered Land Surveyor, on March 16, 1982 ("McKenzie Survey"). Bowater had used what became the Vincent Property for harvesting timber, and the land remained primarily wooded and undeveloped at the time of trial.

At the time Ms. Vincent acquired her property, the respondent, Jerry S. Johnston, Sr., owned approximately 200 acres of forested land to the west and southwest of the Vincent Property ("Johnston Property"). A portion of the chain of title for the Johnston Property dates back to a conveyance from the Tennessee Valley Authority ("TVA") to Mr. Johnston's grandfather, Tyrus Wright, dated December 17, 1948, and recorded in the Register's Office for McMinn County on February 27, 1950. Mr. Johnston testified that while much of his grandfather's original tract had been sold in parcels, he had been acquiring land for several years in an attempt to reconstruct his grandfather's farm. According to Mr. Johnston, he acquired the parcel that he claims includes the Disputed Property through a June 26, 1987 warranty deed, by which grantors Claude and Margaret Tatum conveyed a life estate in the property to Mr. Johnston's mother, Marie Green, with a remainder to Mr. Johnston.[1] Ms. Green subsequently transferred to Mr. Johnston her interest in the relevant portion of the Johnston Property via warranty deed dated December 16, 1993, and recorded in the Register's Office for McMinn County on February 14, 1994 ("1993 Deed"). At trial, Mr. Johnston relied upon the property description regarding the first of two tracts described in the 1993 Deed for his claim of recorded title to the Disputed Property. The Johnston Property is primarily woodland and includes a campground consisting of approximately twenty-six acres set along the Chickamauga Lake, which is fed by the Hiwassee River.

The Disputed Property consists of five acres situated at the southwestern corner of the Vincent Property and the southeastern corner of the Johnston Property. As the property is primarily wooded, it is undisputed that prior to this action, Mr. Johnston's campground tenants regularly rode four-wheelers on dirt trails over the Disputed Property, the southern

---

[1]The original 1987 deed listed only Ms. Green as the grantee, but this deed was corrected by a Deed of Correction, dated April 22, 1988, and recorded May 6, 1988, as conveying a life estate to Ms. Green with the remainder to Mr. Johnston.

tip of which leads to the lake. The property line along the lake is designated as the 685.44 contour on all relevant surveys. The lake is further designated as TVA property. Testimony and photographs also demonstrated that Mr. Johnston built a boat ramp with two boat docks in 1988 where the Disputed Property adjoins the lake. Mr. Johnston and his tenants testified that the Disputed Property contained several improvements, including an asphalt road, metal carport with camper space, and a frame building or cabin. The extent, however, to which these improvements were located on or extended into the Disputed Property was challenged by Ms. Vincent.

Ms. Vincent, who is a licensed real estate agent, asserted in her petition, *inter alia*, that she had no indication Mr. Johnston was claiming the Disputed Property until after closing on her land purchase. Between the time that her offer was accepted by Bowater in late June or early July 2009 and when the sale closed in February 2010, she and her husband, David Vincent, visited the Vincent Property often.[2] Their visits included walking, picnicking, and planning for future building. The Vincents both testified that they sometimes walked across the Disputed Property during this time period but did not see Mr. Johnston on the Disputed Property. Ms. Vincent stated that usually in the wintertime, the water level changed such that Mr. Johnston's tenants could access the shore by traversing the Disputed Property.

The instant dispute occurred following closure on the sale of the Vincent Property in February 2010. The Vincents erected a cable across the dirt road leading to the Disputed Property in an attempt to prevent use of four-wheelers in the area. Ms. Vincent claimed that the first indication she had that Mr. Johnston was claiming the Disputed Property was when he moved the cable and brought in a bulldozer to pack dirt approximately three feet high. This measure effectively blocked Ms. Vincent's access to her property. Testimony indicated that contemporaneously, the Vincents were clearing an area that included part of the Disputed Property when Mr. Johnston stopped a bulldozer operator and instructed him that the Disputed Property was part of the Johnston Property.

Following these incidents, Ms. Vincent retained Registered Land Surveyor Charles R. ("Randy") Brown to survey the Disputed Property. Mr. Brown's survey ("Brown Survey"), completed on September 9, 2011, indicated to Ms. Vincent that the Disputed Property was part of the Vincent Property. Mr. Johnston subsequently retained Registered Land Surveyor Jimmy L. Richmond, who completed his survey of the Disputed Property on July 12, 2012 ("Richmond Survey").

---

[2] Although he testified at trial, David Vincent is not listed on the deed conveying the Vincent Property and is not a party to this action.

Ms. Vincent filed a Petition to Quiet Title and for Declaratory Judgment on December 16, 2011, requesting that she be declared the owner of the Disputed Property. She alleged that Mr. Johnston had encroached and trespassed over her land and had intentionally and/or negligently removed timber belonging to her. By her petition, Ms. Vincent sought relief that Mr. Johnston be ordered to remove all improvements encroaching on her property and be held liable for damages. Mr. Johnston responded by filing an answer and counter-petition on April 25, 2012, asserting that he was the owner of the Disputed Property and alleging that Ms. Vincent had encroached on his property. Mr. Johnston raised the affirmative defenses of waiver/estoppel, champerty, and adverse possession. Mr. Johnston requested that the court declare him to be the owner of the Disputed Property and assess damages against Ms. Vincent for encroachment and destruction of boundary markers.

Concomitantly with his counter-petition, Mr. Johnston filed a motion for temporary injunction, requesting that Ms. Vincent be ordered to refrain from destroying, moving, or encroaching upon boundary markers. The parties subsequently submitted an Agreed Mutual Temporary Injunction, entered by the trial court on May 10, 2012, *inter alia*, enjoining both parties from altering the Disputed Property or interfering with its current use, including recreational use by Mr. Johnston's tenants.

Ms. Vincent filed an answer to the counter-petition on November 8, 2012, asserting as affirmative defenses that Mr. Johnston had not paid taxes on the Disputed Property and that his action was barred by Tennessee Code Annotated § 28-2-109, the statute of frauds, and the doctrine of unclean hands. Following a bench trial conducted over two non-consecutive days on November 14 and 28, 2012, the trial court issued an oral bench ruling, declaring Ms. Vincent the owner of the Disputed Property, denying her request for damages, and dismissing Mr. Johnston's counter-petition in full. The trial court entered a written order incorporating its oral ruling on January 30, 2013. Mr. Johnston timely appealed.

## II. Issues Presented

Mr. Johnston presents five issues on appeal, which we restate as follows:

1.      Whether the trial court erred by failing to find that the true boundary line between the Johnston and Vincent Properties was the northeast boundary of the Disputed Property as depicted on the Richmond Survey.

2.      Whether the trial court erred by finding that Mr. Johnston's warranty deeds, recorded on December 16, 1993, and June 26, 1987, respectively, did not establish color of title to the Disputed Property.

-4-

3.      Whether the trial court erred by failing to find Mr. Johnston in adverse possession of the Disputed Property pursuant to Tennessee Code Annotated § 28-2-101 through -103 and the common law.

4.      Whether the trial court erred by failing to find the warranty deed from Bowater, Inc. to Teresa Vincent, dated February 5, 2010, void as champertous pursuant to Tennessee Code Annotated § 66-4-201 through -205 and common law.

5.      Whether the trial court erred by finding that Ms. Vincent and her predecessor in title had been paying property taxes on the Disputed Property, resulting in an indicia of ownership.

## III.  Standard of Review

In this non-jury real property dispute, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise.  *See* Tenn. R. App. P. 13(d); *Shew v. Bawgus*, 227 S.W.3d 569, 576 (Tenn. Ct. App. 2007) (citing *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001)).  "In order for the evidence to preponderate against the trial court's finding of fact, the evidence must support another finding of fact with greater convincing effect."  *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)).  We review the trial court's conclusions of law *de novo* with no presumption of correctness.  *Shew*, 227 S.W.3d at 576 (citing *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001)).

## IV.  Boundary Line

Mr. Johnston contends that the trial court erred by failing to find that the true boundary line between the Johnston Property and Vincent Property was the northeast boundary of the Disputed Property as depicted on the Richmond Survey.  The court found instead that the Disputed Property lay southwest of the Johnston Property and was not included in the property description contained in Mr. Johnston's 1993 Deed.  Ms. Vincent contends that the trial court properly established the boundary line between the Johnston Property and Vincent Property to be the southernmost line of the Disputed Property, as described in the 1982 McKenzie Survey incorporated into Ms. Vincent's deed and the Brown Survey.  Upon careful review of the evidence in this cause, we agree with Ms. Vincent.

It is well settled in Tennessee that "'[i]n determining disputed boundaries resort is to be had first to natural objects or landmarks, because of their very permanent character; next,

to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances.'" *Wood*, 197 S.W.3d at 258 (citing *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)). As this Court further explained in *Wood*:

The governing rules are near universal and are recited by the Court of Appeals in Ohio in *Sellman v. Schaaf*, 26 Ohio App.2d 35, 269 N.E.2d 60, 66 (1971).

In 11 C.J.S. Boundaries § 3, p. 540, it is said:

"It has been declared that all the rules of law adopted for guidance in locating boundary lines have been to the end that the steps of the surveyor who originally projected the lines on the ground may be retraced as nearly as possible; further, that in determining the location of a survey, the fundamental principle is that it is to be located where the surveyor ran it. Any call, it has been said, may be disregarded, in order to ascertain the footsteps of the surveyor in establishing the boundary of the tract attempted to be marked on the land; and the conditions and circumstances surrounding the location should be taken into consideration to determine the surveyor's intent."

In Clark, Surveying and Boundaries (2d Ed. 1939), it is said at page 727, Section 665:

"The original survey must govern if it can be retraced. It must not be disregarded. So, too, the places where the corners were located, right or wrong, govern, if they can be found. In that case a hedge planted on the line established by original survey stakes was better evidence of the true line than that shown by a recent survey. In making a resurvey it is the surveyor's duty to relocate the original lines and corners at the places actually established and not to run independent new lines, even though the original lines were full of errors."

In 6 Thompson, Real Property, 594, Description and Boundaries, Section 3047 (1962 replacement), the following is stated.

"The line actually run is the true boundary, provided the essential survey can be found and identified as the one called for, and prevails over maps, plats, and field notes. * * * The lines marked on the ground constitute the actual survey and where those lines are located is a matter to be determined by the jury from all the evidence. If the stakes and monuments set at the corners of the parcel in making the survey have disappeared, it is competent to show their location by parol evidence."

At page 599, Secton 3049, it is further said that:

"Marked corners are conclusive and will control over courses and distances. Although stakes are monuments liable to be displaced or removed, they control so long as it is certain that they mark the corners of the original survey."

*Sellman*, 26 Ohio App.2d 35, 269 N.E.2d 60 at 66.

*Wood*, 197 S.W.3d at 255.

In its order quieting title to Ms. Vincent in the Disputed Property, the trial court made the following specific findings of fact, in pertinent part, regarding the boundary line between the parties' properties:

I think it's clear in this case that the surveys show that this was Bowater property. Surveyor Brown points – his points show that his map checks the same as the original TVA 1941 map and the McKenzie survey.

If you look really closely at TVA map 71D, as part of Exhibit 8, the 1967 TVA map shows Tyrus Wright's ownership to come to the southern boundary of the disputed area. That was in 1967.

The Richmond – Mr. Richmond just testified that when you look at the survey in this case, when you look at the maps – he pulled maps, he pulled the survey, he pulled the TVA map – this property is not owned by Mr. Johnston.

So I've got Mr. Richmond, Mr. Brown, both claiming that as surveyors that this property description that Mr. Johnston's claiming under in his 1993 deed does not match what he's claiming it does match on the ground. The courses do not match, the distances do not match, the angles of the lines do not match – the bearings I guess is the word I'm looking for.

Gallagher, who made an excellent witness, testified on behalf of Bowater and verified the location of the 898-1 corner.

And that corner at some point has been moved even per Mr. Richmond's survey, on 10. He found both markers in the same place, which they shouldn't have been under any set of circumstances. This Court hasn't been presented enough proof to decide who moved them, but there's only one party that would have benefitted from the movement of those.

. . .

Mr. Gallagher said that Bowater had walked this property consistently and continued to check their marked boundaries, that the pictures in Exhibit 10 are not consistent with the way Bowater marks their properties, which raises the specter that somebody else attempted to mark that northern boundary to appear as though it were a Bowater marking but it was not.

So I find Mr. Gallagher's testimony and his descriptions to be logical and credible about that line and the disputed issues of fact about who marked that line and what those markings on that line indicate. I also find that the boundaries were also assisted, as another indicia that he on cross-examination was attempting to say that these weren't exact-to-scale maps and he refuted that it was. So since the property's also marked that way as far as the southern boundary line, I find that was the true boundary line, the southern boundary line as on Exhibit 10 and Exhibit 2.

Upon our thorough review of the record, we determine that the preponderance of the evidence supports the trial court's findings on this issue.

The relevant property description in the 1993 Deed upon which Mr. Johnston relies for his claim of ownership to the Disputed Property reads as follows:

TRACT I: BEGINNING at a US-TVA Monument No. 898-1, as identified in the Second Tract of the deed from H.C. Fee and wife, Dorothy Fee, to H.M. Heston and wife, Betty Heston, dated September, 1973; thence in a Southwesterly direction from said beginning point 300 feet to a point; thence in a Southeasterly direction 526 feet, more or less, to a point in the 685.44 contour; thence in a North-Northeasterly direction along said 685.44 contour to a point marked by an angle iron as set forth in the description for the Second Tract in the Fee to Heston Deed; thence North 43 deg 26 min West 565 feet to a point, the place of BEGINNING.

Placement of the beginning marker, TVA Monument No. 898-1, is central to the trial court's finding that the above property description does not include the Disputed Property.

As the trial court noted, both surveyors, Mr. Brown and Mr. Richmond, testified that they did not find the marker to be in the location where it should have been according to the 1982 McKenzie Survey and the TVA map. Mr. Brown further testified that he believed the 898-1 monument had been moved. He stated that prior to Ms. Vincent's land purchase, he had walked the boundaries of the shoreline portion of the Vincent Property in 2006 because at the time, he was considering purchasing the land. He had no indication in 2006 that Mr. Johnston was claiming ownership of the Disputed Area. He added that when he surveyed the Disputed Area in 2011, markers existed that were not present when he walked the boundary in 2006.

Mr. Brown further testified that in addition to referencing the McKenzie Survey, he used maps provided by the Tennessee Valley Authority ("TVA"). He reviewed a TVA map dated May 12, 1941, noting that the map showed the same boundary lines for the Disputed Property as those on the McKenzie Survey. He explained that the location of the 898-1 monument listed on the 1941 TVA map was consistent with the location of the 898-1 monument noted on the 1982 McKenzie Survey. When Mr. Brown surveyed the Disputed Property, he found that the 898-1 monument was missing from the location where it had been located on the TVA map and McKenzie Survey. He opined that the monument had been moved because it was now at a location where, according to the McKenzie Survey, there should have been "a pine tree in a fence." Mr. Brown opined that the 898-1 monument should have been approximately 300 feet southwest of where he actually located it on the ground. This was based on the close match of the balance of the remaining points along the northernmost line to their locations on the 1941 map and 1982 survey. He clarified that the 898-1 monument was now on the "northern line on the McKenzie Survey to the pine tree" and that proceeding southwesterly 312.5 feet, the pin was now missing.

Mr. Brown asserted that he did not agree with the northern boundary line of the Disputed Property as it is represented on the Richmond Survey. Although he agreed with Mr. Richmond's representation of the western boundary line between the Vincent Property and Johnston Property, Mr. Brown indicated the northern boundary did not match any deed he had reviewed. He asserted that the Richmond Survey's southwesternmost line, running north 43 degrees, 26 minutes, zero seconds for a distance of 565 feet, as shown on the Richmond Survey, was the only line that matched the property description for the boundary of the Disputed Property on Mr. Johnston's deed. This is the last call on the deed, "back to the point of beginning" at the 898-1 monument. Mr. Brown further opined that pursuant to the deed's legal description of Mr. Johnston's property, the boundary line is located southwest of where Mr. Johnston is claiming. In reference to Mr. Johnston's 1993 Deed, Mr. Brown summarized:

This deed right here, when we was up there surveying, me and my crew, [Mr. Johnston] had this deed with him. We both read it together. I explained where I thought it was. He objected. I'm fine with that. But based on the TVA documents, on the old prior survey, and even Mr. Richmond's survey, you know, this deed has got to be setting southwest of that line.

When questioned regarding how closely he was able to match his survey to the McKenzie Survey, Mr. Brown stated: "It's very, very close."

Jimmy Richmond, retained as an expert surveyor by Mr. Johnston, testified that when preparing his survey, he consulted TVA maps, deeds, the McKenzie Survey, and Mr. Johnston himself regarding where Mr. Johnston believed the boundary line to be. Mr. Johnston considered the boundary line to be aligned with remains of painted marks on trees, fencing along the northern line of the Disputed Property, and a roadway near that line. Mr. Richmond observed that the roadway was visible and that remnants of fencing could be seen embedded in some of the trees. He stated that he obtained the calls referring to the northwestern and southwestern lines of the Disputed Property from the deeds, the TVA maps, and the McKenzie Survey.

Mr. Richmond testified that the northeastern boundary line depicted on his survey was "strictly a use line that we found on the ground." In reviewing Mr. Johnston's 1993 Deed before conducting the survey, Mr. Richmond believed the deed established title of the Disputed Property in favor of Mr. Johnston. He explained, however, that when he surveyed the Disputed Property, he discovered that the 898-1 monument, the beginning point of the property description, was not located where the McKenzie Survey and TVA maps had shown it to be. He explained:

But the problem that arises, until you go in there and actually begin to do the surveying, the measurements and to locate what's there and realize what's going on, the deed calls for the point of beginning to be a TVA concrete monument, No. 898-1, and if you go out there on the ground there is an existing monument with that number on it, which Mr. Johnston felt like and told us he felt like was his northwest corner. And if you just stand there on that monument and read the deed, you have no reason to think it doesn't go around this piece of property that he feels like is his. When we got into it and began to do the surveying, we realized that there was some other issues.

According to Mr. Richmond, the location of the 898-1 monument on his survey represents the monument's actual location at the time he surveyed. He stated that the monument did not appear to have been moved recently.

Mr. Richmond identified on his survey the location where he actually found the 898-1 monument. He acknowledged that based on the TVA maps and McKenzie Survey, he believed the 898-1 monument should be on the southwestern corner of the Disputed Property. On his survey, he noted that the current location of the 898-1 monument is actually where the TVA map shows the 898-2 monument to be located. He confirmed that the northern boundary line claimed by Mr. Johnston was not consistent with the final call on Mr. Johnston's deed and that the southernmost line of the Disputed Property is consistent with the last call of Mr. Johnston's deed.

Both Mr. Brown's and Mr. Johnston's testimony regarding the current placement of the 898-1 monument and the inconsistency of Mr. Johnston's claimed northeastern boundary line with the property description on his 1993 Deed support the trial court's finding that said boundary line is not the true one and that Mr. Johnston does not hold title to the Disputed Property. The trial court also found that Bowater, as Ms. Vincent's predecessor in title, had been the owner of the Disputed Property and had conveyed it to Ms. Vincent. In reaching this finding, the trial court expressly found Bowater representative Kevin Gallagher to be a highly credible witness. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011) ("When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony.").

The parties stipulated that Hiwassee Land Company and Bowater are different names for the same company. In his employment with Resolute, Mr. Gallagher is the custodian of records regarding the company's land holdings, a responsibility he testified he has maintained since 1982.[3] Mr. Gallagher authenticated a silvicultural weeding report, dated July 27, 1987, regarding the cultivation of trees or site preparation for tree planting on Bowater property. The report included a map identifying the areas treated and areas cleared, including the Disputed Property, which was mechanically cleared of trees and then cultivated in 1987. He also identified a plantation inventory adjustment report, dated March 9, 1988, showing a planting of loblolly pine seedings completed on the Disputed Property on March 1, 1988.

Mr. Gallagher reviewed a boundary marking report, dated August 1982. He explained that the company's procedure, subsequent to obtaining a survey, would have been to send a boundary marking crew to identify and number the corners so that the corner numbers on the report would correspond to those indicated on the map. When he withdrew this boundary

[3]Mr. Gallagher testified that he began working for Bowater in 1982, although until 1984, the division he worked for was known as Catawba Timber Company. Following a merger in 2008, Bowater became part of Abitibi, Inc., and Mr. Gallagher's current employer is known as Resolute F.P. U.S., Inc. At the time of trial, Mr. Gallagher was a forest analyst working in Resolute's United States wood products department.

-11-

marking report from the file, attached was a copy of the 1982 McKenzie Survey. He confirmed that the McKenzie Survey attached to the boundary marking report was the same McKenzie Survey, dated March 16, 1982, previously admitted into evidence. Regarding the TVA 898-1 monument, Mr. Gallagher stated that the boundary report noted the monument at corner number 186 with a steel post placed there.

Mr. Gallagher also reviewed a boundary marking report dated 1984. He explained that it reflected the Bowater boundary crew's work of inspecting the boundary and performing any necessary refurbishing. The crew had walked the entire boundary of the property. An identical copy of the map attached to the 1982 boundary report was attached to the 1984 report. The 1984 report referenced TVA CR 898-1, again corresponding to corner 186 and identifying a steel post. The attached map included the Disputed Property. Mr. Gallagher further reviewed a boundary marking report dated December 1989 with the TVA 898-1 monument similarly referenced. The 1989 report was the final boundary marking report Bowater generated for what is now the Vincent Property and the Disputed Property.

Mr. Gallagher testified that he personally walked what is now the Vincent Property with the Vincents when Bowater was marketing the property for sale in June 2009. When they traversed the land, they came upon a dirt, unimproved road, connecting with Lamontville Road. The property visit continued down to the waterfront and through the woods generally across the entirety of the property. At that time, Mr. Gallagher observed no improvements on the property. He, however, did not go onto the Disputed Property. He knew of no other ownership claims to the land.

Mr. Gallagher stated that he again walked the land with Mr. Vincent in July or August 2009 and at that time, traversed the Disputed Property. He observed that the Bowater map "accurately reflected what was on the ground." The map he referenced was distributed in Bowater's marketing materials and to the Vincents before Ms. Vincent purchased the land. The map reflects that the Disputed Property is within what was then Bowater's property.

Mr. Gallagher further testified that he visited both the Vincent Property and Disputed Property a few weeks in advance of trial. During the visit, he walked the boundary lines with the boundary marking reports and other documents from his file in hand. Mr. Gallagher described Bowater's procedure for marking boundary lines as follows:

> So after a property was surveyed, the corners are placed by the surveyor and boundaries in between the corners are also marked by the surveyor, either by flagging tape or hacking trees on either side of the boundary.

-12-

Subsequent to that, our boundary marking crew would go in and, going by what the surveyor had indicated on the ground, would place steel posts where the corners were. Typically a surveyor might put an iron pin or something like that. We would put a steel post painted orange, identify three witness trees at each corner, so those would be trees in close proximity to the corner, and identify the distance and bearing from the witness tree to the corner. That way if the corner got removed at some point then we would have means to replace it. Then we would mark the boundary in between the corners.

By way of example, if the corner's here (indicating) and another corner is on the corner of that wall over there, the boundary line in between, and if this side is the Bowater property and this side is the alien or adjacent property, we mark trees on either side of that boundary line. And so the trees on the Bowater side would be marked with a single band, a 3 to 4 inch wide band, about a third of the way around the tree facing the property line.

. . .

And then, again, if the Bowater property is over here and this is the alien property, so the trees that are just inside the line on the alien property would be marked similarly but with two bands. So that if someone out there working on the property or inspecting the property, if you were on the Bowater property and you see the property line and you see that you're facing, you're looking at trees that are painted with two stripes, you know you're on the Bowater side of the line. Conversely, if you're on the alien side of the line and you see trees painted with one stripe, you know that you're not on the Bowater property.

As he summarized, in the final analysis, a tree with a single orange band would be on Bowater's property. A tree with a double band would be located on "alien property," in this case, the Johnston Property.

During trial, Mr. Gallagher reviewed photographs taken of trees he observed on the Vincent Property that exhibited boundary markings as noted on the 1989 boundary marking report. He stated that he walked the northernmost line of the Disputed Property and observed a tree shown in a photograph admitted as exhibit 10 and identified on the Richmond Survey as B1 and B2. He indicated that if the northern boundary line were located where Mr. Johnston claims it is, the markings on the tree shown in exhibit 10 would not be consistent with Bowater's method of marking boundaries. As Mr. Gallagher explained, the tree was marked on the south side of the tree facing away from Mr. Johnston's claimed boundary and was marked with a single stripe instead of double stripes.

-13-

Mr. Gallagher also addressed the northernmost corner of the Disputed Property on the Richmond Survey where the Richmond Survey indicates a "METAL POST PAINTED ORANGE, WITH REFERENCE TREES WITH CUT 'X' ON TREES, ALSO PAINTED ORANGE." He noted that this marking is not consistent with the method Bowater had used. When asked to explain why the marking is not consistent, he stated in pertinent part:

First of all, this paint appears to have been placed there more recently than the 1989 marking as we saw in the other photograph. The paint is brighter; it covers more into the fissures and crevices of the bark.

Number two, there are two witness trees at this corner. Our prescribed method was to mark three witness trees so long as there were three available. And there are other trees available that could have been marked, but there's only two, so the boundary marking crew – we would have marked three trees and not just two.

Thirdly, the X's at this spot are not facing squarely the corner, so the method is that the X's would face squarely at the corner. The two witness trees that are marked with X's here, the X's do not face the corner. One of them is offset by approximately 20 degrees and the other is facing almost 60 degrees away from the corner.

Number four . . . all the boundary marking reports have identified witness trees at this corner, which is presumably corner 185 on our map. And the two trees that are marked as witness trees are loblolly pine trees. The boundary marking reports call for a 6 inch elm, a 12 inch sweet gum and a 16 inch loblolly pine, which would have been 16 inches at the time the boundary marking report was done so we would expect to see a much larger diameter tree there by now.

So neither of the trees that are marked are elm or sweet gum and don't match a 16 inch loblolly pine. They are trees that are – these two trees are, one of them is approximately 12 inches and the other is approximately 14 inches in diameter. Also, these two trees originated from the stand that was planted in 1988. They're loblolly pines, they are the same height as the whole stand of loblolly pines that's there, and so they've had 25 growing seasons and that's the reason they're this size now. In 1989 they would have – these trees were planted in 1988; in 1989 the trees would have been one year old.
. . .
And, finally, on the map, this corner on the ground is not reflective of where it would be indicated on our map.
. . .
Based on the topo map and coming across this knob here, I know where that corner is located on the ground relative to our topo map, again I haven't

measured it off on the ground but approximately two, three hundred feet northeast of where our corner is indicated on our map.

Mr. Gallagher acknowledged that while the boundary marking reports had been produced between 1982 and 1989, he worked at the Catawba mill in South Carolina. Regarding the boundary marking reports, he clarified that the "witness trees," which were located on the perimeter of what was then Bowater's property, would not have been removed when the property was cleared in 1987. When attempting to find the witness trees upon his visit to the Disputed Property, he was unsuccessful. In response, Mr. Johnston denied painting any boundary markers or knowing of anyone other than Bowater painting boundary markers.

Mr. Johnston argues that in finding that the northeastern boundary on the Richmond Survey was not the true northeastern boundary line of the Disputed Property, the trial court improperly relied upon the 1982 McKenzie Survey over the Richmond Survey. As noted above, "'[i]n determining disputed boundaries resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances.'" *Wood*, 197 S.W.3d at 258 (citing *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)). In *Wood*, this Court reversed the trial court's placement of a boundary line based upon the pins marking an adjacent landowner's line in a recent survey where an older survey existed that relied on artificial monuments. *Id.* at 259 ("It is agreed by all parties that the platted survey is based upon no natural objects or landmarks. In order of priority, one must then look to artificial monuments or markers before ever relying on boundary lines of adjacent land owners or courses and distances.").

Mr. Johnston argues that in this case, the trial court improperly applied a principle stated in the *Wood* decision as one of several "governing rules" in determining boundary disputes: "[I]t is the monuments laid out by the original surveyor, if they can be located, which govern the boundaries, even if the actual survey used in the plat is in error." *Id.* at 260. Mr. Johnston relies on *Cupp v. Heath*, No. E2010-02364-COA-R3-CV, 2011 WL 3557059 at *5-6 (Tenn. Ct. App. Aug. 11, 2011), to support his argument that because his property and the Vincent Property did not originate from the same landowner, the general hierarchy governing boundaries established in *Thornburg* should apply without deference to an original survey of one property owner's land. In *Cupp*, this Court distinguished the facts from those in *Wood* and concluded that the original survey, created for only one of the parties, did not carry greater weight than more recent surveys because the parties' respective properties did not share a common predecessor in title. *See Cupp*, 2011 WL 3557059 at *7.

-15-

In the case at bar, it is undisputed that the Vincent Property and Johnston Property do not originate with a common landowner. We find Mr. Johnston's analogy to *Cupp* based on this fact misplaced, however. Although there was some testimony regarding trees as natural monuments, neither surveyor was able to rely on the placement of trees in the Disputed Property in preparing his respective survey because of tree cutting in the area since the 1982 McKenzie Survey and execution of Mr. Johnston's 1993 Deed. The trial court then focused on artificial monuments, particularly the placement of the TVA 898-1 concrete monument, the beginning and ending point of the property description for the relevant tract in Mr. Johnston's 1993 Deed. Mr. Richmond testified that he established the northeastern boundary line on his survey on the line as Mr. Johnston was using it. Mr. Johnston testified that in adopting this line as his boundary, he had relied on the dirt trail, the orange "Bowater paint," and the remains of a barbed wire fence in the trees. He clearly stated his belief that the 898-1 monument, as it was placed at the time of trial, was the beginning point of his northern boundary. Both surveyors, however, were unable to align the current placement of the 898-1 monument with the property description in Mr. Johnston's deed. Furthermore, the trial court credited Mr. Richmond's testimony that he found both the 898-1 and 898-2 monuments in the same location, which, as the court noted, "they shouldn't have been under any set of circumstances."

In contrast to Mr. Johnston's assertion regarding the trial court's reliance on the primacy of an early survey over a later one, we conclude that the trial court properly considered the importance of artificial monuments and both expert surveyors' testimony regarding the misalignment between those monuments and the property description in Mr. Johnston's 1993 Deed if any part of the Disputed Property were attributed to that description. *See generally Thornburg*, 606 S.W.2d at 675. The evidence does not preponderate against the trial court's finding that the common boundary line between the Vincent Property and Johnston Property was as described in the 1982 McKenzie Survey incorporated into Ms. Vincent's deed and the Brown Survey. Mr. Johnston is not entitled to relief on this issue.

IV. Color of Title

Mr. Johnston contends that the trial court erred by finding that the property description contained in his 1993 and 1987 warranty deeds, respectively, did not provide him color of title to the Disputed Property. Having found that the calls in the 1993 Deed, which Mr. Johnston claimed enclosed the Disputed Property, did not match what was actually located on the ground by both Mr. Richmond and Mr. Brown, the trial court ruled in its Order that Mr. Johnston's deeds afforded him no color of title to the Disputed Property. Having carefully reviewed the evidence, we agree with the trial court.

Our Supreme Court has defined color of title as "'something in writing which at face value, professes to pass title but which does not do it, either for want of title in the person making it or from the defective mode of the conveyance that is used.'" *Cumulus*, 226 S.W.3d at 376 n.3 (quoting *Thompson on Real Property* § 87.12, at 145 (David A. Thomas ed., 1994)). Mr. Johnston argues that in relying on the surveyors' expert opinions regarding the ultimate issue of which party possessed title to the Disputed Property, the trial court erroneously held Mr. Johnston to a higher burden than required to establish color of title. He further argues that because of natural changes in the Johnston Property between its original metes and bounds description in 1948 and as observed in 2011, the boundaries of the Disputed Property could not have been the same as in the description contained in Mr. Johnston's deed.

We determine these arguments to be unavailing. Having determined that the evidence does not preponderate against the trial court's finding that the description in Mr. Johnston's deed did not include the Disputed Property, we must also conclude that the evidence does not preponderate against the trial court's finding that the description was insufficient to provide color of title. *See Turnage v. Kenton*, 102 Tenn. 328, 334 (1899) (holding that while a description need not be identical in boundaries to the property at issue in order to establish color of title, it must be sufficient to demonstrate that it covers the land in controversy).

## VI. Adverse Possession

Mr. Johnston next argues that the trial court erred by discounting multiple improvements he made to the Disputed Property and finding that his use of the Disputed Property was indicative of trespass rather than adverse possession. Ms. Vincent contends that the trial court properly found that Mr. Johnston's use of the Disputed Property did not constitute adverse possession. We conclude that although the trial court correctly found that Mr. Johnston did not adversely possess the entire five acres constituting the Disputed Property, the trial court did err in failing to find that Mr. Johnston was entitled to the statutory defense of adverse possession in relation to the portion of the Disputed Property upon which certain improvements are located.

Mr. Johnston asserts that he had openly and notoriously possessed the Disputed Property since 1988 and therefore maintains that he was in adverse possession under the common law rule requiring use for twenty years and pursuant to the seven-year use requirement of Tennessee Code Annotated § 28-2-102 (2004) and § 28-2-103. Acquisition of property by adverse possession may operate as a bar to recovery of the property by the title holder, and it may also operate to vest the adverse possessor with title. *See Cumulus*, 226 S.W.3d at 375; *Wilson v. Price*, 195 S.W.3d 661, 666-67 (Tenn. Ct. App. 2005). Our

Supreme Court has elucidated the statutory forms of adverse possession as follows in pertinent part:

> [L]imitations of real property actions, i.e., the statutory forms of adverse possession, are found in Tennessee Code Annotated sections 28-2-101 through 103. Initially, land granted by the state, for example, requires only a period of seven years' adverse possession under a recorded assurance or color of title, terms which are used interchangeably. Tenn. Code Ann. § 28-2-101 (2000); *see, e.g.*, *Slatton v. Tenn. Coal, Iron, & R.R. Co.*, 109 Tenn. 415, 75 S.W.926, 927 (Tenn. 1902). Another provision, Tennessee Code Annotated section 28-2-105, does not require any proof of a state land grant but does prescribe assurance of title for thirty years and a minimum of seven years of adverse possession. The limitations on actions statutes, described in Tennessee Code Annotated sections 28-2-102 and 103, are defensive only, barring only the remedy. *Kittel v. Steger*, 121 Tenn. 400, 117 S.W. 500, 503 (Tenn. 1909). These rights may be utilized by the adverse holder only in the defense of a suit and not as a means to bar use by the rightful owner. *Slavely v. Bridges*, 57 Tenn. App. 372, 418 S.W.2d 472, 479 (Tenn. Ct. App. 1967). Tennessee Code Annotated section 28-2-102 provides a defense when there is assurance of title and seven years possession; this statute serves as protection as to the entire boundary as described. Section 28-2-103, which does not involve color of title, protects an adverse holder after a period of seven years but only as to that portion of the land in his actual possession. *Shearer v. Vandergriff*, 661 S.W.2d 680, 682 (Tenn. 1983).

*Cumulus*, 226 S.W.3d at 376. The Court further described common law adverse possession:

> In our state, common law adverse possession rests upon the proposition "that, where one has remained in uninterrupted and continuous possession of land for 20 years, a grant or deed will be presumed." *Ferguson v. Prince*, 136 Tenn. 543, 190 S.W.548, 552 (Tenn. 1916); *see also Webb v. Harris*, 44 Tenn. App. 492, 315 S.W.2d 274, 277 (Tenn. Ct. App. 1958). Color (or assurance) of title is not required. *Keel v. Sutton*, 142 Tenn. 341, 219 S.W.351, 352-53 (Tenn. 1920); *Hallmark v. Tidwell*, 849 S.W.2d 787, 792-93 (Tenn. Ct. App. 1992). In order to establish adverse possession under this theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. *Hightower v. Pendergrass*, 662 S.W.2d 932, 935 n. 2 (Tenn. 1983); *cf. Menefee v. Davidson County*, 195 Tenn. 547, 260 S.W.2d 283, 285 (Tenn. 1953). Adverse possession is, of course, a question of fact. *Wilson v. Price*, 195

S.W.3d 661, 666 (Tenn. Ct. App. 2005). The burden of proof is on the individual claiming ownership by adverse possession and the quality of evidence must be clear and convincing. *O'Brien v. Waggoner*, 20 Tenn. App. 145, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936). The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. *Kirkman v. Brown*, 93 Tenn. 476, 27 S.W.709, 710 (Tenn. 1894). When an adverse possessor holds the land for a period of twenty years, even absent any assurance or color of title, the title vests in that possessor. *Cooke v. Smith*, 721 S.W.2d 251, 255-56 (Tenn. Ct. App. 1986).

*Id.* at 376-77.

In ruling that Mr. Johnston had not adversely possessed the Disputed Property, the trial court made the following specific and pertinent findings of fact in pertinent part:

As to adverse possession, under the *[Hollow] vs. Butler* case hunting is not enough. Mr. Johnston must prove adverse possession by clear and convincing evidence. What was done here, the riding of four wheelers in this area, is more of an indication of a trespass rather than an open and notorious claim of ownership in this case which is exclusive actual adverse possession. The actual owner must have knowledge of the possession or it must be so open and notorious as to imply a presumption of that through fact. The occasional use of the land is insufficient. That's also in the *Hollow vs. Butler* case.

An aerial view indicates the disputed area was planted, as Bowater planted their other property, as late as 1989 and Bowater cleared that area without dispute or complaint from [Mr. Johnston]. And I find that he has not established that area by adverse possession either, so judgment for [Ms. Vincent].

As the trial court indicated, Mr. Johnston presented extensive testimony regarding his tenants' practice of riding four-wheelers on the trails over the Disputed Property. Five tenants, who paid yearly fees to Mr. Johnston to rent campsites at his campground on undisputed Johnston Property, testified that they rode four-wheelers across the Disputed Property as often as every weekend when weather permitted. According to his tenants and by his own testimony, Mr. Johnston made a practice of showing new tenants what he considered to be his property line so that they would remain on his property when riding or walking. This purported line was of a location to include the Disputed Property. Some tenants testified that they occasionally hunted on the Disputed Property and used it for access

to the lake. It was undisputed that Mr. Johnston had kept the trails used by his tenants, including those on the Disputed Property, clear of brush to the extent that four-wheelers could pass over them.

The trial court found that this recreational use of the Disputed Property was occasional and more indicative of trespass than of adverse possession. We agree with the trial court on this point. The court specifically cited in its order this Court's decision in *Hollow v. Butler*, No. E2010-02150-COA-R3-CV, 2011 WL 3062021 (Tenn. Ct. App. July 26, 2011). In *Hollow*, this Court found the defendant's attempt to demonstrate adverse possession insufficient where the only acts shown were "cattle straying into the Disputed Area, allowing neighbors to hunt, occasional cutting of firewood, repairing of the fence in the Disputed Area, and incident of cutting timber." *See* 2011 WL 2062021 at *9; *see also Heaton v. Steffen*, No. E2008-01564-COA-R3-CV, 2009 WL 2633050 at *5 (Tenn. Ct. App. Aug. 27, 2009) ("Actions such as the taking of firewood and hunting are more indicative of an intent to trespass than an intent to seize and hold the land.") (citing *McCammon v. Merideth*, 830 S.W.2d 577, 580 (Tenn. Ct. App. 1991)). While it is true that Mr. Johnston's tenants' recreational use of the Disputed Area was more frequent than the defendant's use of the disputed area in *Hollow*, we cannot conclude that the acts of riding four-wheelers and hunting rose to the level of the open and notorious use required for adverse possession.

The trial court made no specific findings regarding improvements Mr. Johnston claimed he had made to the Disputed Property. All testimony, including that of Mr. Johnston's tenants, indicated that the majority of the Disputed Property was wooded and crossed by only rough trails requiring four-wheelers for motorized passage. Mr. Johnston, however, testified that he built a boat ramp in 1988, paved a dirt road with asphalt in the early 1990s, constructed a framed building (cabin) for a tenant in 1994, and built a metal carport over a deck for placement of a camper in 2002. Ms. Vincent asserts in her brief on appeal that the only proof Mr. Johnston presented regarding these improvements, aside from his own testimony, was the Richmond Survey showing portions of the framed building and carport encroaching over the boundary line as drawn by Mr. Richmond. We note that in addition, (1) Mr. Richmond testified that he had accurately placed the location of the framed building and carport on his survey; (2) Mr. Johnston presented a photograph of his name and "1988" etched in the cement of the boat ramp; (3) Ms. Vincent testified she had "always questioned that one camper down there at the bottom" by the boat dock, presumably meaning the metal carport and camper base; and (4) the small asphalt roadway, which Mr. Johnston stated extended from the county road to the boat dock, is shown on both the Brown and Richmond Surveys, respectively.

As referenced above, acquisition of property by adverse possession must be, for the requisite period of time, "(a) actual and exclusive; (b) open, visible, and notorious; (c)

continuous and peaceable; and (d) hostile and adverse." *See Cumulus*, 226 S.W.3d at 376. Apart from time considerations, we determine that Mr. Johnston's construction and use of the framed building and metal carport with base have been actual and exclusive; open, visible, and notorious; continuous and peaceable; and hostile and adverse. We are unable to conclude the same for the boat ramp, however, without evidence in the appellate record as to whether the boat ramp is located solely on TVA property at the contour line by the water or encroaches onto the Disputed Property.

Regarding the remaining improvement of the asphalt road along the southern boundary of the Disputed Area, we agree with Ms. Vincent's assertion on appeal that Mr. Johnston failed to present clear and convincing evidence that the road was possessed exclusively by him or his tenants. *See Cumulus*, 226 S.W.3d at 377 ("The burden of proof is on the individual claiming ownership by adverse possession and the quality of the evidence must be clear and convincing."). The paving of the asphalt road does not therefore constitute an improvement sufficient for adverse possession. We note that this conclusion indicates no determination regarding whether Mr. Johnston may be entitled to a prescriptive easement along the asphalt road, as that issue has not been raised by the parties and constitutes an open and unanswered question of use rather than possession. *See id.* at 378 ("A doctrine related to adverse possession is that of prescriptive easement . . . this easement arises when a use, as distinguished from possession, is adverse rather than permissive, open and notorious, continuous and without interruption, and for the requisite period of prescription.").

Regarding the time period considerations, Mr. Johnston stresses that he built the boat dock in 1988, twenty-four years before Ms. Vincent filed her petition and thus exceeding the twenty-year requirement of common law adverse possession. *See Cumulus*, 226 S.W.3d at 376. As noted above, however, we are unable to determine from the record before us that the boat dock encroaches upon the Disputed Property. We therefore cannot conclude that any of Mr. Johnston's encroaching improvements were in existence for at least twenty years prior to the instant action.

In the alternative, Mr. Johnston argues that he is entitled to the defense of adverse possession pursuant to Tennessee Code Annotated § 28-2-102 or § 28-2-103. As recognized previously, Tennessee Code Annotated § 28-2-102 "provides a defense when there is assurance of title and seven years possession" and "serves as protection as to the entire boundary as described." *Cumulus*, 226 S.W.3d at 376; *see also Shearer v. Vandergriff*, 661 S.W.2d 680, 682 (Tenn. 1983). Having determined that the trial court properly found that Mr. Johnston's deed does not afford him color of title, we must conclude that no relief is available under the defense provided by section 28-2-102.

The same is not true, however, for the defense afforded by Tennessee Code Annotated § 28-2-103, which "does not involve color of title" and "protects an adverse holder after a period of seven years but only as to that portion of the land in his actual possession." *See Cumulus*, 226 S.W.3d at 376 (citing *Shearer*, 661 S.W.2d at 682). Tennessee Code Annotated § 28-2-103 provides:

> (a) No person or anyone claiming under such person shall have any action, either at law or in equity, for the recovery of any lands, tenements or hereditaments, but within seven (7) years after the right of action accrued.
>
> (b) No possession of lands, tenements or hereditaments shall be deemed to extend beyond the actual possession of an adverse holder until the muniment of title, if any, under which such adverse holder claims such lands, tenements or hereditaments is duly recorded in the county in which the lands are located.

As this Court has explained:

> Tenn. Code Ann. § 28-2-103 bars the right of the title owner to recover property that has been adversely held for more than seven years. *Teeples v. Key*, 500 S.W.2d 452, 456 (Tenn. Ct. App. 1973). The statute does not convey title, but may be used defensively by the adverse holder. It is "a defensive statute and protects the adverse holder in possession to the extent and upon the terms set forth in the statute." *Moore*, 42 Tenn. App. At 564, 304 S.W.2d at 662; *see also Lemm*, 955 S.W.2d at 73 n.1 (stating that the statute provides a valid defense but does not entitle the adverse holder to a decree granting him title).

*Michael v. Jakes*, No. M1999-02257-COA-R3-CV, 2002 WL 1484448 at *13 (Tenn. Ct. App. July 12, 2002).

Mr. Johnston's testimony that he constructed the framed building in 1994 and the metal carport with camper base in 2002 was undisputed. His adverse use and possession of both encroachments regarding the Disputed Property continued for over seven years. We hold that to the extent Mr. Johnston's improvements of the framed building and metal carport with base encroach upon the Disputed Property, he has established adverse possession of only those portions of the Disputed Property encroached upon. We reverse the trial court's finding of no adverse possession solely in this regard. We remand for determination of the portions of the Disputed Property encroached upon by Mr. Johnston's frame building and metal carport with base. On remand, we also direct the trial court to determine whether Mr. Johnston's boat ramp adversely encroaches upon the Disputed Property and if so, by what

measure of real property. On remand, the parties should be allowed to present additional evidence regarding the extent of each specified improvement's encroachment. *See First Tenn. Bank Nat'l Assoc. v. Hurd Lock & Mfg. Co.*, 816 S.W.2d 38, 40 (Tenn. Ct. App. 1991) ("[T]his court, in its original opinion, envisioned and intended that the trial judge, on remand, take all action necessary to do complete justice, including the reception of additional proof.").

## VII. Champerty

Mr. Johnston posits that the trial court should have afforded him the presumption of champerty as to the validity of Ms. Vincent's deed, thereby shifting the burden to Ms. Vincent to overcome the presumption by clear and convincing evidence. The trial court, having found no adverse possession on Mr. Johnston's part, also denied Mr. Johnston's claim of champerty. We conclude that the trial court did not err in affording no presumption of champerty to Mr. Johnston, and we further conclude that Mr. Johnston's minimal adverse encroachments, noted in the previous section of this opinion, do not render Ms. Vincent's deed champertous.

As Mr. Johnston acknowledges, a finding of adverse possession is a prerequisite to a finding of champerty. *See Foust v. Metcalf*, 338 S.W.3d 457, 464 (Tenn. Ct. App. 2010). As this Court explained in *Foust*:

> Champerty originated in English Common Law; it was designed to prevent the "trafficking of dormant titles." *See* 14 Am. Jur. 2d Champerty, Maintenance, Etc. § 12 (2010). Historically, a conveyance of real estate was considered champertous and void if the deed was conveyed when the real property was in the adverse possession of someone other than the grantor. *Id.*

> Tennessee is one of the few jurisdictions in the United States that still recognizes champerty. *See id.*; *see also Levine v. March*, 266 S.W.3d 426, 437 n. 13 (Tenn. Ct. App. 2007). Tennessee's law of champerty is embodied in Tenn. Code Ann. § 66-4-201 *et seq.* Pursuant to Tenn. Code Ann. § 66-4-202, an agreement to sell land "shall be utterly void where the seller has not personally, or by the seller's agent or tenant, or the seller's ancestor, been in actual possession of the lands or tenements, or of the reversion or remainder, or taken the rents or profits for one (1) whole year next before the sale." The statute renders void any sale of real property when another is in adverse possession, even where the grantor holds the land in perfect title. *Green v. Cumberland Coal & Coke Co.*, 110 Tenn. 35, 72 S.W. 459, 460 (1903). As this court explained in *Levine v. March*:

Tennessee champerty statutes prohibit the sale of pretended interests in real property. Tenn. Code Ann. § 66-4-201 (2004). They also include the presumption that a sale of any interest in real property by a person without actual or constructive possession of the real property is champertous. Tenn. Code Ann. § 66-4-205 (2004). The purpose of these statutes is to protect persons in actual possession of an interest in real property from suits based on pretended or dormant claims, unless the suits are instituted in good faith by persons with bona fide claims of title. *Williams v. Hogan*, 19 Tenn. (Meigs) 187, 189 (1838).

266 S.W.3d at 437-38. The court elaborated in a footnote to this paragraph that, "[t]his statute can trace its lineage at least as far back as 32 Henry VII, ch. 9 (1540) . . . . Tennessee is among the handful of states that continue to recognize this species of champerty." *Id.* at 437 n. 13.

In the more recent opinion of *Mitchell v. Keck*, No. E2005-02381-COA-R3-CV, 2006 WL 1735142, at *2 (Tenn. Ct. App. June 26, 2006), this court stated:

Under [the champerty statutes], if one out of possession attempts to convey land which is adversely possessed by a third party, the conveyance is void. *Kincaid v. Meadows*, 40 Tenn. (3 Head) 188, 192, 1859 WL 3430, at *2 (1859); *Blair v. Gwosdof*, [46 Tenn. App. 314,] 329 S.W.2d 366, 368 (Tenn. Ct. App. 1959). Regardless of the validity of the conveyor's title to the land, such title becomes merely a pretended title, within the statute, when there is an attempt to convey it under such circumstances. *Kincaid*, 40 Tenn. (3 Head) at 192, 1859 WL 3430, at *2; *Blair*, 329 S.W.2d at 368. There is no required duration of adverse possession by the third party; all that is required is that the third party adversely possess the land at the time of the conveyance. *Kincaid*, at 192; *Blair*, at 368.

Adverse possession requires "an occupation of the property under a claim of right or title which is open, actual, continuous, exclusive, adverse and notorious." *Catlett v. Whaley*, 731 S.W.2d 544, 546 (Tenn. Ct. App. 1987).

Tenn. Code Ann. § 66-4-203 goes on to provide that any suit brought for the recovery of real property "shall be forthwith dismissed, with costs, by the court in which such suit may be pending," upon a finding by the court that the deed conveying the property to the plaintiff was champertous. *See Levine*, 266 S.W.3d at 438 (stating that "legal claims based on champertous deeds are subject to dismissal").

*Foust*, 338 S.W.3d at 462-63. "In champerty cases, the adverse possession 'must be at least as high in nature and dignity as that possession which is held to be adverse under the statute of limitation'"). *Id.* at 464 (quoting *Gernt v. Floyd*, 174 S.W. 267, 268 (Tenn. 1915)).

Regarding the presumption of champerty, Tennessee Code Annotated § 66-4-205 (2004) provides:

If any person sells any lands or tenements, not having possession of them personally or by agent or tenant, *the same being adversely held by color of title*, champerty shall be presumed until the purchaser shows that such sale was bona fide made.

(Emphasis added.) Inasmuch as we have determined that the trial court correctly found Mr. Johnston to possess no color of title to the Disputed Property through his 1993 Deed, we further determine that the trial court correctly declined to afford Mr. Johnston the champerty presumption provided by Tennessee Code Annotated § 66-4-205.

Regarding the encroachments of the framed building and carport with base, Mr. Johnston has not presented on appeal any authority to support a position that such minimal adverse encroachments with no color of title constitute the nature and dignity of adverse possession required to find the rightful title holder's deed to be a pretended title and thus champertous. Upon our review of the relevant case law, we decline to so hold. *See, e.g.*, *Foust*, 338 S.W.3d at 459-66 (reversing the trial court's denial of the defendant's champerty defense when the defendant possessed color of title to a "narrow but substantial strip of land," known by the parties as an "interlock," and had constructed a fence to enclose a portion of the interlock); *McDavid v. McGuire*, 526 S.W.2d 474, 479 (Tenn. Ct. App. 1973) (determining that the defendant landowners' deeds were champertous as to a one-fourth acre parcel of land that had been given but never deeded to a church by the defendant landowners' predecessor in title and had been adversely used as a parking lot and roadway by church members for twenty years); *Mitchell v. Keck*, No. E2005-02381-COA-R3-CV, 2006 WL 1735142 (Tenn. Ct. App. June 26, 2006) (affirming the trial court's finding that a quitclaim

deed to the plaintiff of a twenty-foot drive was champertous when the grantors of the quitclaim deed were heirs to an interest in the drive only under a prior deed in the plaintiff's chain of title and had executed the quitclaim deed only after the defendant, who adversely possessed the drive, refused to grant the plaintiff an easement in the drive). Mr. Johnston is not entitled to relief on this issue.

## VIII. Property Taxes as Indicia of Ownership

Mr. Johnston contends that the trial court erred in finding sufficient evidence to support an indicia of ownership in favor of Ms. Vincent based on the payment of real property taxes on the Disputed Property. In its order vesting title in the Disputed Property to Ms. Vincent, the trial court found, *inter alia*, that Ms. Vincent and her predecessor in title, Bowater, had been paying taxes on the Disputed Property. We conclude that the evidence does not preponderate against this finding and that the trial court properly considered payment of taxes on the Disputed Property as one indicia of ownership.

Tennessee Code Annotated § 28-2-109 (2000) provides:

Any person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom such person claims have paid, the state and county taxes on the same for more then [sic] twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom such person claims have had, such person's deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for such period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of such land.

Mr. Johnston bases his argument regarding this issue on what, upon our review of the record, we find appears to have been a point of confusion in the McMinn County Assessor of Property's testimony. Assessor Jerry Anderson testified that the tax map for the Vincent Property assessed 122.8 acres, inclusive of the Disputed Property. He stated also that prior to Ms. Vincent's acquiring the Disputed Property, taxes on the land at issue were assessed to Ms. Vincent's predecessors in title. On cross-examination, he allowed that if Mr. Johnston's 1993 deed actually contained a description for a portion of property that had been assessed by his office to Ms. Vincent, that assessment would be in error. Mr. Anderson did not, however, testify to any error in assessment of the taxes on the Disputed Property. As noted previously, we owe great deference to the trial court as to the weight and credibility afforded each witness. *See Morrison*, 338 S.W.3d at 426. This issue is without merit.

## IX. Conclusion

For the reasons stated above, we reverse the trial court's finding of no adverse possession with regard solely to the extent that Mr. Johnston's improvements of the framed building and metal carport with base encroach upon the Disputed Property. We remand for determination of the portions of the Disputed Property adversely encroached upon by Mr. Johnston's frame building and metal carport with base, as well as a determination of whether Mr. Johnston's boat ramp adversely encroaches upon the Disputed Property and if so, by what measure of real property. The trial court's judgment is affirmed in all other aspects. Costs on appeal are assessed equally to both parties.

_____
THOMAS R. FRIERSON, II, JUDGE